**In re XO COMMUNICATIONS, INC., Reorganized Debtor.**

**Aron Rosenberg, Plaintiff,**

**v.**

**XO Communications, Inc., Eagle River Investments, L.L.C., and Craig O. McCaw, Defendants.**

**Bankruptcy No. 02–12947 (AJG).**
**Adversary No. 03–3179 (AJG).**

United States Bankruptcy Court,
S.D. New York.

Sept. 23, 2005.

Abraham & Associates (Jeffrey S. Abraham, Esq., of Counsel), Fruchter & Twersky LLP (Mitchell M.Z. Twersky, Esq., Jack G. Fruchter, Esq., of Counsel), Law Offices of David Carlebach, Esq. (David Carlebach, Esq., of Counsel), New York, NY, for Plaintiff, Aron Rosenberg.

Simpson Thacher & Bartlett LLP (Bruce D. Angiolillo, Esq., John W. Carr, Esq., Peter V. Pantaleo, Esq., Daniel H. Tabak, Esq., O. Andrew F. Wilson, Esq., of Counsel), New York, NY, for Defendants, Craig O. McCaw and Eagle River Investments, L.L.C.

Brown Rudnick Berlack Israels LLP (Andrew Dash, Esq., Todd A. Feinsmith, Esq., Leslie H. Scharf, Esq., Steven Smith, Esq., of Counsel), New York, NY, for Reorganized Debtor–Defendant, XO Communications, Inc.

**OPINION DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIM FOR RELIEF REQUESTING DECLARATORY JUDGMENT THAT CONFIRMED PLAN OF REORGANIZATION AND PLAN CONFIRMATION ORDER DO NOT RELEASE DEFENDANTS FROM PLAINTIFF'S SECURITIES ACTION PURSUANT TO SECTION 16(b) OF SECURITIES EXCHANGE ACT OF 1934 AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING SUCH CLAIM FOR RELIEF**

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The issue before the Court is whether a federal securities action pursuant to section 16(b) ("Section 16(b)") of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), see 15 U.S.C. § 78p(b), and the rules promulgated thereunder by the Securities and Exchange Commission (the "SEC"), to obtain disgorgement of short-swing insider trading profits for the benefit of the reorganized debtor, is subject to (1) the release, dis-

charge, and injunction provisions within the debtor's plan of reorganization, (2) the plan's confirmation order, (3) a stipulated settlement entered in a state court shareholder class action, (4) a state court final order and judgment approving such stipulated settlement, or (5) this Court's order approving such stipulated settlement, and if the section 16(b) action is subject to any of the foregoing, whether it (the action) is thereby precluded or barred.[1] Upon review of the parties' pleadings and arguments made at a hearing, the Court finds that plaintiff's section 16(b) action is not subject to, or precluded or barred by, any of the foregoing.[2]

## I. Background

### A. *Section 16(b) Action*

In June 2000, Plaintiff Aron Rosenberg ("Plaintiff"), a New York resident, was a shareholder of Nextlink Communications, Inc. ("Nextlink"), a holding company formed under the laws of the State of Delaware (which changed its name to XO Communications, Inc. ("XO" or the "Debtor") on October 20, 2000) whose subsidiaries provide telecommunication services in several states. Aside from being a shareholder through owning Nextlink common stock, Plaintiff was a bondholder through his purchase of Nextlink senior notes on December 5, 2001.

Plaintiff's counsel sent a letter dated June 21, 2000 to the board of directors of Nextlink demanding that the corporation recover alleged short-swing profits realized by Eagle River Investments, L.L.C. ("Eagle River"), a limited liability company formed under the laws of the State of Washington by Craig O. McCaw ("McCaw," and collectively with "Eagle River," the "Defendants"[3]), in connection with their purchase and sale of securities issued by Nextlink, whereby such transactions allegedly violated Section 16(b) of the Exchange Act. Nextlink responded in a letter dated August 14, 2000 that it would not bring a Section 16(b) suit against Defendants to recover such realized profits.

Thereafter, Plaintiff, as a shareholder of Nextlink, commenced an action on August 29, 2000 in the United States District Court for the District of Delaware (the "Delaware District Court"), Civil Action No. 00–795–JJF (the "Section 16(b) Action"), against Defendants and Nextlink for alleged violations of Section 16(b), seeking, for the benefit of the Debtor, disgorgement of over $36 million in short-swing profits allegedly realized by Defendants. At the time of the alleged Section 16(b) violations, Plaintiff asserts that Eagle River was majority-owned and managerially controlled by McCaw and that Defendants were both statutory insiders of Nextlink as a result of beneficially owning

---

**1.** The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(b) and under the "Standing Order of Referral of Cases to Bankruptcy Judges" issued on July 10, 1984 by the United States District Court for the Southern District of New York (Ward, Acting C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is properly before this Court pursuant to 28 U.S.C. § 1409(a).

**2.** This opinion constitutes the Court's finding of facts and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to rule 7052 of the Federal Rules of Bankruptcy Procedure. Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

**3.** While the term "Defendants" refers collectively to the alleged Section 16(b) statutory insiders, that is, McCaw and Eagle River, the term does not include XO (formerly known as Nextlink), the issuer of the relevant securities, which is named as a nominal defendant in Plaintiff's Section 16(b) Action.

more than 10 percent of Nextlink common stock and/or by virtue of McCaw serving as a director of Nextlink.

On November 15, 2000, Defendants moved to dismiss the Section 16(b) Action contending that (1) there was no purchase as required by Section 16(b)'s purchase and sale requirement, and (2) the purchase and sale of Nextlink stock cannot be matched because they were from two different issuers, that is, from predecessor corporation, "old" Nextlink, which merged into a shell, successor corporation, "new" Nextlink. The Delaware District Court denied Defendants' said motion on September 11, 2002, finding that there was ambiguity in law on both issues. The law firm Willkie Farr & Gallagher LLP ("Willkie Farr") represented Defendants in the Section 16(b) Action, but withdrew from that representation on notice in December 2001. Thereafter, Willkie Farr continued to represent XO on other matters and ultimately was retained as XO's bankruptcy counsel in its chapter 11 proceeding.

## B. *Investment Agreement Between XO And Investors*

Prior to 2002, XO and its predecessors raised approximately $2.5 billion in equity capital through offerings of two series of common stock and eight separate classes of preferred stock. XO also incurred approximately $5.7 billion in indebtedness pursuant to a senior credit facility, ten separate series of senior notes and one issue of subordinated notes.

XO, like other firms in the telecommunications business, encountered severe financial difficulties in 2001. Market valuations of telecommunications firms declined significantly and new capital or credit became difficult to locate. During 2001, XO consulted several investment banks to explore the possibilities of raising new capital, de-

leveraging XO's existing debt or restructuring its existing obligations.

In October 2001, XO retained Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") as its outside restructuring financial advisor to assist in exploring a variety of deleveraging alternatives, including both a stand-alone restructuring and investment scenarios, both in and out of bankruptcy. Based on information that XO provided, Houlihan Lokey determined that XO had a $500 million "funding hole," representing the additional financing that XO would need based on XO's forecasted operating results and capital expansion plans, even without further bond interest and principal and preferred stock dividend and principal payments after December 1, 2001.

XO determined it would be in the best interests of its creditors if it were to withhold certain interest payments on some of its outstanding notes that were due in early December 2001 and proceed with a restructuring of its notes and other obligations. XO believed that the announcement of an additional equity infusion would perhaps ameliorate the negative consequences of announcing that it would not be making the interest payments. XO therefore sought to identify a potential source of additional funding prior to December 2001.

Houlihan Lokey thereafter solicited potential investors and entities in an effort to raise the required new capital for XO. Although a number of potential investors engaged in due diligence in October and November 2001, only one investment proposal was received. The proposal was from Forstmann Little Investors (as defined in the Plan and hereinafter "Forstmann Little") and a then-unidentified investor later identified as Teléfonos De México, S.A. de C.V. ("Telmex," and together with Forstmann Little, the "Investors"). On November 21, 2001, the Investors submitted a

draft term sheet that proposed a $700 million equity investment in XO conditioned on, among other things, a substantially deleveraged balance sheet.

On November 28, 2001, XO entered into a non-binding term sheet that its board of directors had approved whereby the Investors agreed to invest $800 million in XO in exchange for new equity in XO (the "Investors' Proposal"). The Investors' Proposal contemplated that all or substantially all of XO's outstanding equity would be eliminated, but unsecured noteholders would be offered 18 percent of reorganized XO's equity along with $200 million in cash. On the same date, the Investors and Eagle River informed XO that the Investors had reached a preliminary understanding with Eagle River under which Eagle River would be given the opportunity to participate in a portion of the $800 million investment contemplated by the Investors' Proposal. Following the execution of the term sheet, XO ceased making all cash interest and dividend payments on its unsecured debt obligations and preferred stock, respectively, that were due on or after December 1, 2001.

From November 28, 2001 to January 15, 2002, XO engaged in extensive negotiations regarding the terms and conditions of the Investors' Proposal with the Investors and Eagle River. Meanwhile, Houlihan Lokey continued to search for alternative investors in an effort to procure a competing proposal to the Investors' Proposal. On January 14, 2002, Eagle River informed XO that it would not participate in the investment by the Investors.

On January 15, 2002, after Houlihan Lokey did not find or locate other sources of investment, XO and the Investors entered into a binding stock purchase agreement (the "Investment Agreement"). The Investment Agreement reflected the terms and conditions of the Investors' Proposal and subject to satisfaction of a number of conditions, including that certain pending or threatened litigation, against XO, the Investors or their respective officers and directors, be resolved in a manner satisfactory to each Investor (the "Litigation Condition").[4] Notwithstanding the foregoing, Houlihan Lokey continued to hold discussions with potential alternative sources of capital after the execution of the Investment Agreement.

### C. Pre–Petition Shareholder Class Actions

#### 1. New York And Delaware State Court Shareholder Class Actions

In December 2001 and January 2002, four state law shareholder class actions

---

4. Section 5.2(u) of the Investment Agreement provides the following Litigation Condition:

> 5.2 *Conditions to Obligations of Each Investor.* The obligation of each Investor to consummate the transactions contemplated hereby shall be subject to the satisfaction, in the judgment of each Investor, or waiver by such Investor at or prior to the Closing of each of the following conditions:
>
> . . . .
>
> (u) Any and all Litigation pending or threatened against the Company or its Affiliates, officers, directors, employees, representatives, attorneys and agents, and any and all Litigation pending or threatened against either Investor or its respective Affiliates, officers directors, managers, partners, members, stockholders, employees, representatives, attorneys and agents, related to the Company, its business, its governance, its securities regulatory disclosure practices, the purchase or sale of any of the Company's equity or debt securities, the Investment or the Restructuring Transaction, shall have been resolved in a manner that is satisfactory to each Investor in its sole discretion; *provided,* that neither Investor shall be able to assert the failure of this condition to be satisfied solely as a result of pending Ordinary Court Litigation. . . .

Investment Agreement § 5.2(u), at 29, 33 (emphasis in original).

alleging breaches of fiduciary duty were filed against XO, its officers and directors, Forstmann Little and/or Telmex by plaintiffs consisting of all public shareholders of XO (except for the defendants and any person or entity affiliated with the defendants). Three of the four class actions were filed in Supreme Court of the State of New York, County of Nassau (the "New York Supreme Court") and consolidated by order dated April 5, 2002, styled as *Irving Schoenfeld, et al. v. XO Communications, Inc., et al.*, Index No. 01–018358 (the "New York Shareholder Action"), naming, among others, XO, McCaw, and the Investors as defendants. The remaining action was filed on January 16, 2002 in the Court of Chancery of the State of Delaware, County of New Castle, styled as *Ben Marshall Riley v. Daniel F. Akerson et al.*, Civil Action No. 19353 (the "Delaware Shareholder Action"), naming, among others, McCaw and Forstmann Little as defendants, but not naming XO and Telmex as defendants.[5] Eagle River was neither a defendant in the New York Shareholder Action nor the Delaware Shareholder Action.

The respective complaints in the New York Shareholder Action and the Delaware Shareholder Action each allege that XO's officers and directors breached their fiduciary duties to XO's shareholders by, among other things, approving the Investment Agreement without undertaking steps to obtain the best offer possible (that is, not pursuing an alternative transaction that did not result in the elimination of common equity). The New York Shareholder Action complaint also alleges that Forstmann Little and Telmex aided and abetted these alleged breaches of fiduciary duty, and the Delaware Shareholder Action complaint alleges that Forstmann Little aided and abetted these alleged breaches of fiduciary duty.

The New York Shareholder Action complaint sought, among other things, (1) declarations that (a) the action is properly maintainable as a class action and certifying plaintiffs as the representatives of the class (the "Class"), (b) defendants have breached their fiduciary duties to plaintiffs and other Class members, and (c) that the Investors' Proposal is a legal nullity, (2) to enjoin defendants and all persons acting with them from consummating or closing the proposed transaction, (3) to rescind and to set aside such transaction if it is consummated, and (4) unspecified compensatory damages, with interest, costs, expenses, and attorneys' fees arising from such transaction. The Delaware Shareholder Action similarly sought to enjoin defendants from taking further steps to consummate the Investors' Proposal.

## 2. *Virginia Federal District Court Shareholder Class Actions*

Following the announcement in November 2001 of the Investors' Proposal that led to the Investment Agreement, nineteen class actions were brought on behalf of XO's shareholders in the United States District Court for the Eastern District of Virginia (the "Virginia District Court") against XO, Forstmann Little, and certain XO officers and directors. These actions were consolidated by order dated January 23, 2002 into a single case, styled as *In re XO Communications, Inc. Securities Liti-*

---

**5.** In April 2002, two additional state law actions were filed against XO pursuant to 8 Del.Code § 220 by alleged shareholders of XO in the Court of Chancery of the State of Delaware, New Castle County, seeking access to certain corporate books and records regarding XO's Investment Agreement with the Investors. *See* Disclosure Statement With Respect to the Third Amended Plan of Reorganization for XO Communications, Inc., at 73 & App. D (entitled "Pending Litigation").

*gation,* Civil Action No. 01–1832–A (the "Virginia Shareholder Action").

On March 29, 2002, the lead plaintiff in the Virginia Shareholder Action filed a consolidated amended complaint naming Forstmann Little and XO's board of directors, including McCaw, as defendants, but XO was not named as a defendant. The amended complaint alleged that (1) XO's then chief executive officer and chairman of the board of directors was liable under section 10(b) of the Exchange Act (and rule 10b–5 promulgated thereunder) for material misstatements that artificially inflated the market price of XO stock, (2) XO's director defendants, contrary to state law, breached their fiduciary duties to XO's shareholders by entering into the proposed Investment Agreement with the Investors, and (3) Forstmann Little aided and abetted these breaches of fiduciary duty. The amended complaint's federal securities claims were purportedly brought on behalf of all persons who acquired XO common stock from April 4, 2001 through November 29, 2001. For these federal securities claims, the lead plaintiff in the amended complaint sought unspecified compensatory damages, with interest, and any costs and expenses incurred. The state law breach of fiduciary duty claims were brought on behalf of XO's current shareholders. For these claims, the lead plaintiff in the amended complaint sought to enjoin the defendants from taking steps to consummate the Investment Agreement, as well as damages.

On May 31, 2002, following a hearing on defendants' motions to dismiss on the grounds that (1) the federal securities claims failed to state a claim for which relief can be granted, and (2) the Virginia District Court lacked subject matter jurisdiction over the state law breach of fiduciary duty claims, the Virginia District Court dismissed the Virginia Shareholder Action with prejudice and denied plaintiffs' request for leave to file a further amended complaint. By order dated June 17, 2002, the Virginia District Court also denied plaintiffs' motion for reconsideration and plaintiffs did not appeal.[6]

### D. XO's Restructuring Proposals

From January 2002 through March 2002, XO and the Investors held negotiations with representatives of a committee formed by senior noteholders (the "Senior Note Committee") in an effort to develop terms of the restructuring proposal that would be acceptable to Investors and the members of such committee. During those negotiations, the Investors proposed to increase their investment to a total of $820 million. However, on March 8, 2002, the Senior Note Committee rejected the Investors' revised proposal. On the same day, in connection with that rejection, certain senior noteholders presented XO with an alternative restructuring proposal. Three days later, that proposal was rejected by XO, in part, on the advice of Houlihan Lokey.

On March 22, 2002, XO received a preliminary term sheet from the Icahn Group (as such group is defined in the Disclosure Statement) and the Senior Note Committee contemplating a $500 million equity investment in XO for an indirect 50 percent equity ownership interest in XO as an alternative to the transactions contemplated by the Investment Agreement (the "Icahn Proposal"). On April 1, 2002, the Icahn Group submitted a revised draft

---

**6.** Another federal securities action, *Gable v. XO Communications, Inc. et al.,* naming, among others, XO and McCaw as defendants, was first filed in the United States District Court for the Southern District of California, but was transferred to the Virginia District Court by order dated May 6, 2002, where it was dismissed on June 3, 2002.

term sheet with the support of the Senior Note Committee, proposing a transaction in which $550 million would be invested in XO. The investment and corporate reorganization transactions contemplated by the Icahn Proposal was contingent on the approval of the senior secured lenders (the "Senior Secured Lenders"). However, in early May 2002, XO and Icahn Group's negotiations with the Senior Lenders Committee to amend a certain senior credit facility (that is, a certain credit and guaranty agreement between XO and lenders) that would permit and facilitate the Icahn Proposal ended without agreement. Afterwards, the Icahn Group delivered a letter to the Senior Lenders Committee stating that they would attempt to block and contest any other transaction.

At about that time, continuing declines in market valuations of companies in the telecommunications industry resulted in numerous bankruptcy filings related to that industry. In rapid succession, companies like Williams Communications, Flag Telecom, and Global Crossing were seeking bankruptcy protection.[7] Parties looking to invest in telecommunications companies were becoming exceedingly scarce—if not already impossible to find. Unless there was a substantial change in the state of the market at that time, finding an investment proposal equivalent to the Investors' Proposal would most likely have been impossible.

Concerned about the dramatic deterioration of conditions within the telecommunications debt and equity securities market, the increasing improbability of finding another investment proposal, and the high likelihood that the closing of the Investors' Proposal would be controverted, the Senior Secured Lenders requested in May 2002 that XO prepare a modified business plan contemplating a stand-alone investment that assumed no receipt of additional third-party equity capital. The stand-alone plan would be implemented if the Investment Agreement were to be terminated, or if XO, after consultation with the Senior Secured Lenders, were to conclude that the Investors would not comply with their obligation to close under the Investment Agreement upon satisfaction of applicable conditions under the agreement.

Recognizing both the superior financial recovery offered by the transactions contemplated by the Investment Agreement and the uncertainty engendered by conditions thereto, XO concluded that the most appropriate course of action would be to advance a plan of reorganization which addressed two scenarios. The first scenario was the transaction contemplated by the Investment Agreement. The second scenario was the restructuring contemplated by a stand-alone term sheet, which would be used if the Investment Agreement were terminated or if XO were to conclude that the Investors would not comply with the their obligation to close under the Investment Agreement. In furtherance of such plan of reorganization, the Senior Lenders Committee circulated bank plan-support agreements in late May 2002 to the Senior Secured Lenders providing for them to support the plan contemplated by the Investment Agreement. However, on May 31, 2002, the Senior Lenders Committee informed XO that the bank plan-support agreement had not been executed. That was due to a request by Forstmann Little that XO delay its anticipated chapter 11 bankruptcy filing for a seven to ten day period to permit another round of due diligence on the part of Forstmann Little

**7.** WorldCom, Inc. (Case No. 02–13533(AJG)) filed for bankruptcy about a month after XO's Petition Date.

and to allow for discussions between the Senior Lenders Committee and Forstmann Little concerning a less conditional investment transaction at a lower valuation.

### E. *Settlement Negotiations Of New York Shareholder Action*

On June 6, 2002, Investors' counsel delivered a letter to XO's counsel stating that they considered it "virtually impossible" that the conditions to the Investment Agreement, including the Litigation Condition, would ever be satisfied. While acknowledging that the Investment Agreement remained in full force and effect, the Investors asked XO to release them from their obligations under the Investment Agreement. XO, through its counsel, responded that it disagreed that it was "virtually impossible" that such conditions would ever be satisfied and reminded the Investors that the Investment Agreement requires each Investor to use its reasonable best efforts to consummate and make effective the transactions contemplated by the Investment Agreement. The Investors had advised XO that they intended to avail themselves of any available conditions to their obligations under the Investment Agreement applicable at the time of the closing that would allow the Investors not to complete the transactions contemplated by the Investment Agreement. However, the Investors had not terminated the Investment Agreement, or asserted that they had any right to do so. If XO concluded that the Investors had wrongfully terminated the Investment Agreement, or wrongfully failed to close thereunder, XO would elect to pursue claims in an action against the Investors for, among other things, breach of contract, and seek damages and/or specific performance as remedies for such breach.

Since the Investors were not required to complete the Investment Agreement unless the New York Shareholder Action, among other things, was resolved, and since the recoveries under the Investors' Proposal were superior for XO's various creditor constituencies compared to the proposed stand-alone plan, XO and the Senior Secured Lenders, beginning in June 2002, engaged in settlement negotiations with the plaintiffs in such action. In sum, the parties sought to resolve the New York Shareholder Action to facilitate XO's satisfaction of the Litigation Condition in the Investment Agreement, with a view toward consummating transactions under said agreement to secure for XO and its creditors a superior financial recovery offered by such transactions. At the same time they sought to provide material and substantial consideration to XO's common shareholders. In particular, out of such recovery, the Senior Secured Lenders would compensate the Class, at no additional cost to the Investors, for the plaintiffs and the Class agreed to dismiss the New York Shareholder Action. In the alternative, the parties recognized that satisfaction of the Litigation Condition could provide XO with the basis for a meritorious and valuable cause of action against the Investors if they wrongfully terminated the Investment Agreement or breached their obligations thereunder. If that were the case, the Class could also share the benefits of any recovery from such potential action in consideration of dismissing their claims under the New York Shareholder Action. Further, in light of the contingent nature of the recoveries available from either a consummation of the Investment Agreement or a successful action for breach thereof, XO, the Senior Secured Lenders, and the plaintiffs believed it appropriate that, in consideration for plaintiffs' Class agreeing to settle the New York Shareholder Action, the rights of common shareholders of XO under the contingency stand-alone plan be vested,

clarified, and enhanced. That was to be done to better assure them a right to purchase equity in a reorganized XO, regardless of whether XO were to maintain a successful action for breach of the Investment Agreement by the Investors.

### F. *XO's Chapter 11 Bankruptcy Filing*

On June 17, 2002 (the "Petition Date"), XO filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), proposing the plan of reorganization, which set forth its two alternative restructuring options, and filed a related disclosure statement. The first alternative, known as the "FL/Telmex Plan," contemplated the Debtor emerging from bankruptcy with consummation of the Investment Agreement. The second, called the "Stand-Alone Plan," contemplated the Debtor emerging from bankruptcy without consummation of the Investment Agreement where it would obtain capital from other sources. Under either plan, the outstanding equity stock of XO would be eliminated, but senior notes would not be cancelled. As stated previously, Willkie Farr was retained as counsel to the Debtor and Debtor in Possession.

On June 21, 2002, notice was given to parties in interests, including Plaintiff through his counsel, of the commencement of the Debtor's bankruptcy. Provided with the notice, among other things, were copies of the First Amended Plan of Reorganization and accompanying disclosure statement. The United States Trustee appointed an official committee of unsecured creditors (the "Committee") in the Debtor's bankruptcy case on June 25, 2002.

### G. *Stipulated Settlement In New York Shareholder Action*

Following extensive arm's-length negotiations regarding settlement of the claims asserted in the New York Shareholder Action, XO and the plaintiffs executed a Stipulation of Compromise and Settlement (the "Shareholder Stipulation") on July 11, 2002. The Shareholder Stipulation received the support of XO's senior secured lenders and the Committee.

Upon the effective date of the Shareholder Stipulation, the plaintiffs and the "Class" agreed to release, forever discharge, and forever be enjoined from prosecuting any "Settled Claims" against any of the "Released Parties" [8] (hereinafter

---

**8.** Shareholder Stipulation defines "Class," "Effective Date," "Released Parties," and "Settled Claims" as follows:

 *Class* means all persons and entities who were public common shareholders of XO as of June 17, 2002 (except the Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) and their successors in interest through the Distribution Record Date [that is, XO's confirmation date].

 . . . .

 *Effective Date* means the first date that each and all of the conditions set forth in Section C of the [Shareholder] Stipulation have been satisfied or expressly waived by XO in writing.

 . . . .

 *Released Parties* means: (i) the Defendants [in the New York Shareholder Ac-

tion]; (ii) the Forstmann Little Entities; (iii) Reorganized XO; (iv) the current and former directors, officers and employees of XO; (v) the Senior Secured Lenders and the Administrative Agent; (vi) the respective affiliates and current and former officers, partners, directors, employees, agents, members, shareholders, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons), and professionals of the foregoing.

 . . . .

 *Settled Claims* means all claims, demands, debts, rights, causes of action or liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, including known and unknown claims, foreseen or unforeseen, then existing or thereafter arising in law,

such release entitled the "Shareholder Stipulation Release"), whereby the obligations pursuant to such stipulation would be in full and final disposition of the New York Shareholder Action against the defendants in said action. Shareholder Stipulation § B.1 ("Releases and Termination of the Action"), at 12.

In consideration for the plaintiffs and the Class giving the Shareholder Stipulation Release and agreeing to full and final disposition and dismissal of New York Shareholder Action, XO agreed to provide Class members with a potential recovery under either the FL/Telmex Plan or the Stand–Alone Plan. If the FL/Telmex Plan was adopted, $20 million in cash interest otherwise payable to the Senior Secured Lenders would instead be distributed, less tax, expenses, costs and attorneys' fees, to Class members on XO's confirmation date. In the event that the Stand–Alone Plan was consummated or an alternative transaction other than the Investment Agreement occurred, the Class would receive one-third in cash of any successful recovery (the "Successful Recovery") from any claim, cause of action, demand, suit, liability, or recovery, by way of judgment, settlement or otherwise, obtained by or on behalf of XO or reorganized XO, based upon any breach or failure by one or more of the Investors to consummate the transactions contemplated by the Investment Agreement, up to a maximum recovery of one-third of $60,000,000 ($20,000,000), plus 3 percent of the gross value of any cash recovery in excess of $60,000,000. In the event that the Successful Recovery involved receipt by any party of consideration other than cash or cash equivalents, then two independent financial advisors, selected by the plaintiffs and XO, would agree on a value for the Successful Recovery. If no agreement could be reached between these two investment advisors, then such advisors would appoint a neutral advisor to value the Successful Recovery. Additionally, the Stand–Alone Plan provided the Class with the ability to participate in a certain rights offering of equity securities in the reorganized XO. Regardless of the form and amount of the consideration referred to above, it was characterized by the Debtor in the Plan as a "gift" from the Senior Secured Lender to the Class to fund the Shareholder Stipulation.

Section C of the Shareholder Stipulation (entitled "Conditions to Effectiveness") set forth several condition precedents before the stipulation could become effective, including, among other things, the following (1) entry of a New York Supreme Court order (a) conditionally certifying, for purposes of the settlement only, that the New York Shareholder Action may proceed as a class action by the plaintiffs as Class rep-

equity or otherwise, whether under state or federal law, and whether directly, indirectly, derivatively, representatively or in any other capacity, in connection with, based upon in whole or in part, arising out of or related to any claim that has been or could have been brought in the [New York Shareholder] Action or in connection with, based upon, arising out of or relating to any act or omission, transaction, event or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Investment Agreement, the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement or this Settlement (excluding any claim against XO to enforce the terms of this Settlement), and including without limitation any claim relating to the commencement prosecution or settlement of an Investor Litigation or the decision not to commence or prosecute an Investor Litigation.

Shareholder Stipulation § A ("Certain Definitions"), at 6–7, 9–10 (emphasis in original). Since the Shareholder Stipulation also stated *"Debtor* means XO, as debtor and debtor in possession in the Chapter 11 Case," arguably a party could take the position that the term "Debtor" did not incorporate the pre-petition existence of XO.

resentatives, (b) scheduling a hearing on whether the proposed settlement should be approved as fair, reasonable, and adequate to Class members, (c) approving the form and content of notice and directing to give notice to Class members, that is, (i) mailing of the Notice of Pendency of Class Action, Proposed Settlement and Hearing Thereon (the "Shareholder Settlement Notice") by first class mail to Class members, and (ii) publication of Summary Publication Notice (the "Summary Notice") once in the national edition of the *The Wall Street Journal*, (d) finding that publication of the Shareholder Settlement Notice and Summary Notice constitutes best notice practicable under the circumstances and is due and sufficient notice of matters set forth in the notice to all Class members and fully satisfies the requirements of due process pursuant to the New York Civil Practice Law and Rules, and (e) providing that any person or entity who would otherwise be a member of the Class who so desires may exercise the right to exclude him/her/itself from the Class, but only if he, she or it complies with the requirements for so doing as set forth in the Shareholder Settlement Notice, (2) entry of final judgment by the New York Supreme Court approving the settlement embodied in the Shareholder Stipulation and dismissing the complaint therein with prejudice, (3) the United States Bankruptcy Court for the Southern District of New York must approve the Shareholder Stipulation, and (4) on or before the effective date of such stipulation, (a) dismissal of the Virginia Shareholder Action shall not have been appealed by plaintiffs in that action or any appeal shall have been dismissed without the need for any court approval or with such court approval as is necessary, and (b) dismissal of the Delaware Shareholder Action by plaintiffs in that action without the need for any court approval or with such court approval as is necessary.

## H. *State Court And Bankruptcy Court Approval Of Shareholder Stipulation*

On July 22, 2002, the New York Supreme Court issued an order, which, among other things, conditionally certified the New York Shareholder Action as a class action on behalf of the Class, approved the form of notice of settlement to members of the Class and scheduled a hearing for August 22, 2002. On such hearing date, the New York Supreme Court issued an order and final judgment (the "New York Final Order and Judgment") which, among other things, approved the settlement terms of the Shareholder Stipulation, noted that non-excluded plaintiffs and Class members are deemed to have released and forever discharged Settled Claims against the Released Parties, and dismissed the complaint therein with prejudice.

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (hereinafter each rule entitled "Bankruptcy Rule"), the Debtor filed a motion on August 2, 2002 seeking the Court's approval for the Debtor to enter into the Shareholder Stipulation. In the Debtor's affidavit in support of the proposed scheduling order concerning its Bankruptcy Rule 9019 motion, the Debtor specifically sought this Court's approval not to provide notice of the motion to over a thousand creditors, including bondholders, and to shareholders. In that, the Debtor argued that such notice would not warrant the expense, would be time-consuming, and, regarding the creditors, there was an active Creditors' Committee in place who would receive notice. Apparently, notice to shareholders was not sought because they received the Shareholder Settlement Notice under the New York Shareholder Action as members of the Class. The affidavit proposed only

noticing major parties in interest, including the Office of the United States Trustee, counsel to the Debtor's pre-petition bank lenders, counsel to the Creditors' Committee, and counsel to the Investors.

On the same date, the Court issued a scheduling order (the "Scheduling Order") concerning the Debtor's Bankruptcy Rule 9019 motion. In addition to the notice to parties in interest mentioned in the affidavit, the Scheduling Order also included notice to counsel for the plaintiffs in the New York Shareholder Action and all other parties who had filed notice of appearances. The Scheduling Order found such notice constituted good and sufficient notice of the motion and no other or further notice was necessary or required.

Subsequently, on August 26, 2002, the Court held a hearing on the Debtor's Bankruptcy Rule 9019 motion and issued an order (the "Shareholder Stipulation Approval Order") on the same day approving the Shareholder Stipulation pursuant to Bankruptcy Rule 9019.

## I. *XO's Plan Confirmation And Reorganization*

On July 22, 2002, the Debtor filed its Third Amended Plan Of Reorganization For XO Communications, Inc. (the "Plan") and disclosure statement with respect to the Plan (the "Disclosure Statement"), where such Disclosure Statement was approved by Court order on the same day and the confirmation hearing date was also set for August 26, 2002. The Disclosure Statement did not mention the Section 16(b) Action or make reference in any way to that action.

On July 26 or 27, 2002, Plaintiff, through his counsel in the Section 16(b) Action, was mailed notice of the approval by this Court of the Disclosure Statement and notice of the Plan's confirmation hearing date. The Court confirmed the Debtor's reorganization proposal with regard to the FL/Telmex Plan on August 26, 2002. On August 29, 2002, the parties in the Section 16(b) Action, as well as the Delaware District Court, were notified by counsel for the Debtor in that action through a document entitled "Suggestion of Bankruptcy" that due to the Debtor's bankruptcy filing on the Petition Date, the action was stayed pursuant to Bankruptcy Code section 362, *see* Compl. ¶ 45. The Suggestion of Bankruptcy was docketed in the Delaware District Court on August 30, 2002.[9]

The Plan provided that in the event (1) the Investment Agreement was terminated by the Investors or XO, or (2) XO concludes that the Investors will not consummate transactions contemplated by the Investment Agreement, and thus the FL/Telmex Plan was not implemented, XO was to send notice (the "Stand–Alone Notice") to the Court, among others, expressing such applicable facts and indicating its intention to proceed with the Stand–Alone Plan. On October 15, 2002, the Debtor delivered the Stand–Alone Notice to the Court and confirmation hearing was held on November 15, 2002 to consider the Stand–Alone Plan.

By order dated November 15, 2002 (the "Confirmation Order"), the Court confirmed the Plan as it relates to the Stand–Alone Plan and the Plan became effective on January 16, 2003 (the "Effective Date"). Following the Debtor's reorganization, an entity controlled by Mr. Carl C. Icahn[10]

---

**9.** On September 29, 2003, the Delaware District Court entered an order that the Section 16(b) Action is stayed and would be administratively closed pending disposition of the instant matter.

**10.** Several months before the Petition Date, affiliates of Carl Icahn, that is, High River Limited Partnership and Meadow Walk Limited Partnership (the "Icahn Entities"), purchased substantial quantities of senior notes

held more than 80 percent of the reorganized Debtor's outstanding new common stock. A new board was established and McCaw ceased to have any role or position in the newly reorganized XO.

Under the Stand–Alone Plan, the Senior Secured Lenders claims of $1 billion were not paid in full and the unsecured creditors with claims of nearly $5 billion were to receive 1 to 2 percent of their claims in the form of stock representing approximately 5 percent of the reorganized Debtor's equity. The Debtor characterized, as set forth in the Disclosure Statement, such distribution to unsecured creditors as a "gift" from the Senior Secured Lenders (that characterization was disputed by the Creditors' Committee). The Plan did not require McCaw or Eagle River to contribute any capital towards the reorganization or pay any monies.

At the November 15, 2002 confirmation hearing, the Court also approved an agreement (the "Investors Settlement"), dated October 13, 2002, between the Debtor and the Investors, agreeing to settle their disputes under the Investment Agreement. On November 26, 2002, in accordance with the Investors Settlement, the Investors paid $25 million to the Debtor. Under the terms of the Shareholder Stipulation, that sum constituted a Successful Recovery out

issued by XO. In addition, prior to the confirmation hearing for the Stand–Alone Plan, the Icahn Entities purchased approximately 85 percent of the Senior Secured Lenders' claims against XO and, therefore, had a significant influence over the confirmation process and subsequent reorganized XO.

11. Defendants do not assert that the exculpation and limitation of liability provision of Plan section 10.5(b), which provides that the Debtor, reorganized XO, and any of their respective current or former officers and directors, and affiliates, among others, shall not incur any liability to any claimant for any act or omission in connection with or arising out of the Debtor's restructuring, includes the Section 16(b) Action.

of which one-third (or $8.33 million) would be distributed to public common shareholders of XO on XO's confirmation date.

## J. Plan's Releases, Discharge, And Injunctions

There are several Plan provisions in dispute in this instant matter, that is, (1) the Debtor's release (the "Debtor's Release") pursuant to Section 10.4(a) of the Plan, (2) release by holders of claims and interests (the "Claimants' Release," and together with the Debtor's Release, the "Plan Releases") pursuant to Section 10.4(b)(ii) of the Plan, (3) discharge of claims and termination of interests pursuant to Section 10.2 (the "Plan Discharge"), and (4) injunctions pursuant to Sections 10.3 and 10.6 of the Plan (the "Plan Injunctions").[11]

In general, Section 10.4 of the Plan provides that the Debtor and reorganized XO are deemed to release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities based on occurrences taking place on or prior to the Effective Date in any way relating to, among others, the Debtor, reorganized XO, XO's chapter 11 case, the Plan, or the Disclosure Statement against, among others, the Debtor's current and former directors.[12] In addition, Section 10.2 of the

12. Subsection (a) and (b)(ii) of Section 10.4 of the Plan specifically states, in relevant part, as follows:

(a) ... As of the Effective Date, the Debtor and Reorganized XO, in their individual capacities and as debtor in possession, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities ... whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on

Plan discharges all claims against the Debtor that arose prior to the confirmation date and precludes any entity from asserting such claims.[13] Moreover, Section 10.3

or prior to the Effective Date in any way relating to the Debtor, Reorganized XO, the parties released pursuant to this Section 10.4, the Chapter 11 Case, or this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate or Reorganized XO, whether directly, indirectly, derivatively or in any representative or any other capacity, against (i) the current and former directors, officers and employees of the Debtor ... and the Debtor's agent, and Professionals, and the respective affiliates and current and former officers, partners, directors, employees, agents, members, shareholders, advisors, and professionals of the foregoing....

. . . .

(ii) On the Effective Date, in the event the Stand–Alone Events occur, (i) each Holder of a Claim or Interest that voted to accept the Plan and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all Holders of Claims and Interests, in consideration for the obligations of the Debtor and Reorganized XO under this Plan, and the Warrants, New Reorganization Common Stock and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, and each entity (other than the Debtor) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan, the Investment Agreement, if applicable, and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, this Plan or the Disclosure Statement against (i) the current and former directors, officers and employees of the Debtor and such Professionals' affiliates and current and former

officers, partners, directors, employees, agents, members, shareholders, advisors, and professionals (but in all events excluding the Investors with respect to any breach by either of them under the Investment Agreement)....

Plan § 10.4(a), (b)(ii). In turn, Sections 1.19 and 1.57 define "Claim" and "Interest," respectively, as follows:

1.19 Claim means a "claim" as defined in section 101(5) of the Bankruptcy Code.

. . . .

1.57. Interest means (a) the legal, equitable, contractual and other rights of any person with respect to the Other Old Equity, Old Common Stock or Old Preferred Stock and (b) the legal, equitable, contractual or other rights of any person to acquire or receive any of the foregoing....

Plan §§ 1.19, 1.57 (emphasis in original).

**13.** Section 10.2 of the Plan states, in part, as follows:

(a) Except as provided in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for, and in complete satisfaction, discharge and release of, all Claims and termination of all Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Confirmation Order or this Plan, Confirmation shall (a) discharge the Debtor from all Claims and other debts that arose before the Confirmation Date and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted this Plan; and (b) terminate all Interests and other rights of equity security holders in the Debtor; *provided, however, all obligations under the Senior Credit Facility shall survive except to the extent expressly replaced by the Amended and Restated Senior Credit Facility.

(b) As of the Confirmation Date, except as provided in this Plan or the Confirma-

of the Plan permanently enjoins any entities that have held claims or interests against the Debtor (as well as a holder of an allowed claim or interested that has accepted a distribution pursuant to the Plan) from, among other things, commencing or continuing any action or proceeding against the Debtor or reorganized XO.[14] Further, Section 10.6 permanently enjoins any person or entity from commencing or prosecuting any claim that is released or exculpated pursuant to Section 10.4 and 10.5 of the Plan.[15]

The Confirmation Order approved the foregoing Plan Releases, Plan Discharge, and Plan Injunctions. Furthermore, the

Confirmation Order found that each nondebtor party that will benefit from the Plan Releases, waivers of claims and Plan Injunctions "shares an identity of interest with the Debtor and has contributed substantial assets to the Debtor's reorganization, which assets will provide for certain [d]istributions that would not otherwise be available but for the contribution made by such non[ ]debtor parties." Confirmation Order Art. V, ¶ RR. In addition, the Confirmation Order noted that "[s]uch releases, waivers and injunctions are essential to such reorganization and one of the impacted classes, Class 1 [(that is, Senior Secured Lender claims)], has voted to accept

tion Order, all entities shall be precluded from asserting against the Debtor, Reorganized XO, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such claims and rights of equity security holders in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time to the extent that such judgment relates to a discharged Claim or Interest.

Plan § 10.2.

**14.** Section 10.3 of the Plan expressly provides as follows:

(a) Except as otherwise provided in this Plan, entities who have held, hold or may hold Claims against or Interests in the Debtor are (i) permanently enjoined from taking any of the following actions against the Estate or any of its property on account of any such Claims or Interests and (ii) permanently enjoined from taking any of the following actions against the Debtor, Reorganized XO, or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or re-

covering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.

(b) By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in this Section.

Plan § 10.3.

**15.** Section 10.6 further provides as follows:

10.6. *Injunction Related to Releases and Exculpation.* The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 10.4 and 10.5 of this Plan.

Plan § 10.6 (emphasis in original).

its proposed treatment under the Plan." [16] *Id.*

## K. *Post–Confirmation ERISA Action*

On November 18, 2002, three days after entry of the Confirmation Order, Margaret Clifton and Lori Shreck, who were participants in the XO Communications, Inc. 401(k) Plan Savings and Retirement Plan (the "401(k) Plan"), commenced a class action (the "Clifton Action"), on behalf of the 401(k) Plan and all current and former participants in such plan, for whose individual plan accounts held shares of XO common stock from April 4, 2001 to date (the "Clifton Plaintiffs"), in the United States District Court for the Southern District of New York (Case No. 02 CV 9230) against the Debtor, one of its officers, and two of its directors, including McCaw, pursuant to section 502(a) of the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1132(a)). The Clifton Plaintiffs alleged, among other things, that the defendants therein breached their duties to the 401(k) Plan and plan participants in violation of ERISA section 404 (29 U.S.C. § 1104) because, among other things, they mismanaged Plan assets, continued to offer XO common stock as an investment option under the Plan when XO's true financial condition was being concealed, failed to act solely in the interests of 401(k) Plan participants and beneficiaries, and failed to disclose in certain SEC filings that XO had entered into agreements with entities related to Forstmann Little whereby all of XO's public equity would be wiped out and ownership of XO would be transferred to XO's management, noteholders and entities related to Forstmann Little.

The Debtor moved on December 6, 2002 for an order enforcing the Confirmation Order, the Shareholder Stipulation Approval Order and the automatic stay under Bankruptcy Code section 362(a), arguing that commencement of the Clifton Action violated (1) the Plan because (a) Section 10.2(a) expressly discharges the Debtor from "all Claims and other debts that arose before the Confirmation Date" and terminates "all Interests and other rights of equity security holders in the Debtor," (b) Section 10.4(b)(ii) releases the Debtor's officers and directors from liability to any current or former security holder of the Debtor as to any matter relating to the Debtor arising prior to the Effective Date, (c) Section 10.5(b) explicitly exculpates the Debtor and its officers and directors from liability to "any Holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtor's restructuring, including without limitation, the negotiations and execution of the Investment Agreement . . .," and (d) Sections 10.3 and 10.6 permanently enjoin any person or any entity from prosecuting any action against the Debtor or its officers and directors concerning any claim that is subject of such Plan discharge, releases, and exculpation provisions; (2) the Shareholder Stipulation Release since it provided for a broad release for the Debtor and related third parties from all "Settled Claims," defined to include all claims under state or federal law, "whether directly, indirectly, derivatively, representatively or in any other capacity," in connection with any pre-confirmation act or omission relating to the Debtor, the Investment Agreement or any of the acts alleged in the settled action; (3) the Shareholder Stipulation Approval Order and Confirmation

---

16. Section OO of article V of the August 26, 2002 order confirming the Plan contained similar language on nondebtor identity of interest and substantial contribution as in section RR of article V of the Confirmation Order of the Stand–Alone Plan; the only difference between the two sections concerned which impacted classes voted to accept the Plan.

Order containing the foregoing releases, discharge and/or injunctions; and (4) the automatic stay because it was extended until the Effective Date and the Clifton Plaintiffs made no effort to seek relief from the stay prior to initiating their action.

While not opposing continuation of the automatic stay as to the Clifton Action and not seeking to recover against the Debtor, the Clifton Plaintiffs on January 8, 2003 objected to the Debtor's motion, contending that (1) none of the settled securities class actions, including the New York Shareholder Action and Virginia Shareholder Action, alleged ERISA violations, and (2) none of the class representatives in the settled actions had standing to represent the Clifton Plaintiffs because only a current or former 401(k) Plan participant (or beneficiary) had standing to allege ERISA violation claims, who obtained and held their XO common stock through participation in the 401(k) Plan. Accordingly, the Clifton Plaintiffs asserted that since neither the Shareholder Stipulation nor any other settled securities actions involving XO asserted, or had standing to assert, the ERISA claims in the Clifton Action, the orders entered approving those settlements do not release the nondebtor defendants in the Clifton Action. Further, the Clifton Plaintiffs argued that to the extent that the Confirmation Order could be read as a final release of nondebtors from ERISA claims that were never asserted in the settled actions, such a release would violate Bankruptcy Code section 524(e), which prohibits the discharge of debts of nondebtors. Therefore, the Clifton Plaintiffs maintained the Confirmation should not be applied to enjoin their action against the nondebtor defendants, including McCaw.

In its reply filed on January 14, 2003, the Debtor asserted, among other things, that (1) while the Clifton Plaintiffs did not object to continuation of the automatic stay, no formal steps were taken to dismiss the action, (2) the Clifton Plaintiffs forfeited their right to object to the Plan's releases, discharge, exculpations, and injunctions because (a) despite being given sufficient notice of the Disclosure Statement noting such Plan provisions and opportunities to be heard regarding the Plan, they failed to timely raise objections or appeal such Plan provisions prior to confirmation and offered no excuse for their untimely objections, (3) the Plan and Confirmation Order are now final and cannot be subject to collateral attack, and (4) the Plan's Releases do not violate Bankruptcy Code section 524(e) because where, as the Court held in the Confirmation Order, *see supra* Confirmation Order Art. V, ¶ RR, releases or permanent injunctions in favor of nondebtor entities are central for a debtor's reorganization, Bankruptcy Code section 105 vests bankruptcy courts with the inherent power to release nondebtors and enjoin any person from asserting future claims against the releases.

Additionally, the Debtor noted that although the Clifton Plaintiffs contend that plaintiffs in the New York Shareholder Action lacked standing to assert ERISA "holder" claim for breaches of fiduciary duty, as opposed to securities "purchaser" claims, the settlement class was a class of holders of XO common stock, not purchasers, and the putative class in the Clifton Action is established by participant's ownership of XO common stock. The Debtor also pointed out that even though the ERISA claims in the Clifton Action were based on a different legal theory than the New York Shareholder Action, a central allegation by the Clifton Plaintiffs was that the defendants failed to disclose that XO had entered into the Investment Agreement that anticipated a restructuring that would "wipe out" all of the Debtor's equity

securities, which was essentially the same claim made by the Class in the New York Shareholder Action that was settled as part of the Shareholder Stipulation. Furthermore, the Debtor argued that since there was an overlap between the ERISA class in the Clifton Action (that is, 401(k) holders of XO common stock at any time since April 4, 2001) and the Class in the New York Shareholder Action (that is, holders of XO common stock as of Petition Date and their predecessors and successors in interest), any recovery by the ERISA class would also go to members of the Class who already gave a complete release in exchange for $8.33 million settlement consideration (that is, the shareholders one-third share of the Debtor's Successful Recovery against the Investors), which constituted a clear breach of the Shareholder Stipulation. In the alternative, even if the Shareholder Stipulation did not provide for a release of ERISA claims by each and every member of the ERISA class in the Clifton Action, the Plan releases and related injunctions barred such claims at any time.

A hearing was held on January 15, 2003 to hear the Debtor's December 6, 2002 motion to enjoin the Clifton Plaintiffs from maintaining the Clifton Action. On February 3, 2003, the Court issued an order overruling the Clifton Plaintiffs' objections, enjoining them from prosecuting and continuing the Clifton Action, and ordering them to dismiss the action. In the order, the Court found that (1) the Debtor and its officers or directors in the action, including McCaw, have been discharged, released, and enjoined from prosecution pursuant to Plan sections 10.2, 10.3, 10.4, 10.5 and 10.6 and the Confirmation Order, (2) the Debtor and its officers or directors, including McCaw, have been released and enjoined from prosecution pursuant to the Shareholder Stipulation and the Shareholder Stipulation Approval Order, (3) the Debtor

was subject to the automatic stay under Bankruptcy Code Section 362(a) at the time the action was commenced, and (4) "that due and sufficient notice of the Plan, Confirmation Order and Shareholder Stipulation were provided to all holders of claims and interests in the Debtor...." The Clifton Plaintiffs did not appeal the order.

## L. *Instant Adversary Proceeding*

On May 9, 2003, Plaintiff filed his complaint (the "Complaint") in the instant adversary proceeding, seeking two claims for relief. First, the Complaint seeks revocation of the Confirmation Order pursuant to Bankruptcy Code section 1144 because the order was procured by fraud based on two alleged omissions from the Debtor, that is, (1) except for a minor reference to the Section 16(b) Action in an affidavit submitted by Willkie Farr in connection with its application to be retained as bankruptcy counsel to the Debtor, the Debtor did not disclose the pending Section 16(b) Action in its Disclosure Statement or on the schedule of outstanding shareholder litigation attached thereto, and the Debtor mischaracterized the action in its statement of financial affairs (the "Statement of Financial Affairs") filed on June 24, 2002, and (2) Willkie Farr did not adequately disclose in the Debtor's bankruptcy case that it had represented McCaw in the Section 16(b) Action prior to December 2001, when it withdrew as counsel. Second, the Complaint seeks a declaratory judgment that the confirmed Stand–Alone Plan and Confirmation Order do not release Defendants from the Section 16(b) Action. As to that second claim for relief, the Complaint specifically asserts that the Claimants' Release under the Plan, by its own terms, limits the release "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date." Compl. ¶ 57 (quoting Plan § 10.4(b)(ii)). The Com-

plaint further contends that (1) neither Defendants Eagle River or McCaw, nor any other insider or non-insider gave new consideration in support of the Plan, and (2) Defendants are not entitled to be released under applicable law, including, but not limited to, section 29 ("Section 29(a)") of the Exchange Act. Compl. ¶ 58–59.

In response, on July 17, 2003, the Debtor moved to dismiss Plaintiff's first claim for relief regarding revocation of the Confirmation Order pursuant to Rule 12(b) of the Federal Rules of Civil Procedure (hereinafter each rule entitled "Rule"), made applicable to this adversary proceeding by Bankruptcy Rule 7012(b).[17] However, the Debtor stated in its motion that it supports Plaintiff's second claim for relief seeking a declaratory judgment because it provides an alternative mechanism to address Plaintiff's primary concern herein, which is the continued viability of his Section 16(b) Action against Defendants. The following day, Defendants filed a motion to dismiss the Complaint in its entirety pursuant to Rules 8(a), 9(b), and 12(b)(6).[18] In turn, on October 4, 2003, Plaintiff filed opposition briefs to the Debtor's and Defendants respective motions to dismiss and, on December 1, 2003, Plaintiff filed a motion for partial summary judgment and statement of material facts with regard to the second claim pursuant to Rule 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056. The Debtor and Defendants filed reply briefs in further support of their respective motions to dismiss on December 19, 2003 and, on the same day, Defendants

filed an opposition brief to Plaintiff's motion for partial judgment and response to Plaintiff's statement of material facts. On January 21, 2004, Plaintiff filed a reply brief in further support of his motion for partial judgment. A hearing was held regarding said motions on February 4, 2004.

On September 30, 2004, this Court issued a memorandum decision denying Plaintiff's first claim for relief, where it found that (1) the request for revoking the Confirmation Order pursuant to Bankruptcy Code section 1144 was rendered moot because the Stand–Alone Plan was substantially consummated as of the Effective Date and it was virtually impossible to unwind the transactions related to such substantial consummation at the time Plaintiff brought this adversary proceeding approximately four months after the Effective Date, and (2) since many third parties had taken possession of the reorganized Debtor's debt and equity securities post-confirmation, including those who purchased securities on the open market after the distribution was made, it would be a significant burden if the Confirmation Order were revoked. Subsequently, an order was entered on October 8, 2004 dismissing Plaintiff's first claim for relief. This opinion addresses Plaintiff's second, and remaining, claim for relief.

## II. Discussion

### A. Standards Of Review

#### 1. Rule 12(b)(6) Dismissal Standard Of Review

Rule 12(b)(6) provides, in pertinent part, that a complaint should be dismissed

---

**17.** While the Debtor moved to dismiss Plaintiff's first claim for relief pursuant to Rule 12(b), the Court assumes that such motion refers to subsection (6) of Rule 12(b) since the remaining subsections appear inapplicable.

**18.** The Court declines to address Defendants' motion to dismiss regarding Rule 8(a) because, beyond merely citing the rule, they

failed to specifically articulate a basis for moving under Rule 8(a) and, even if their motion in its entirety could be construed to provide such a basis, the Court finds that Plaintiff's Complaint satisfies the elements of the rule. The Rule 9(b) reference is to first claim for relief which claim was, as stated above, previously addressed by the Court.

for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6); *see* FED. R. BANKR.P. 7012(b). In considering a Rule 12(b)(6) motion, a court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992).

Further, although the Court accepts all the factual allegations in the complaint as true in determining such a motion, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Rather, to withstand a motion to dismiss, the "claims must be 'supported by specific and detailed factual allegations'...." *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

In determining the sufficiency of a plaintiff's claim for Rule 12(b)(6) purposes, a court may consider the factual allegations in the complaint, documents attached to the complaint as an exhibit or incorporated therein by reference, matters of which judicial notice may be taken, or documents in which plaintiff has notice, possession or knowledge of and on which plaintiff relied on in commencing the action. *See Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

In contrast, when assessing the sufficiency of the complaint, the court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154. Moreover, the plaintiff would be prejudiced as it lacked notice that such material would be considered. *Id.* at 153. Therefore, a court must either exclude such material from its consideration of the Rule 12(b)(6) motion or convert the motion to one for summary judgment providing the parties the opportunity to conduct discovery and supplement the record with additional material to support a Rule 56 motion. *Id.* at 154. Nevertheless, where a plaintiff has chosen not to attach a document to the complaint or incorporate it by reference where the plaintiff relies heavily on such document and it is integral to the complaint, a court may consider a document in deciding a Rule 12(b)(6) motion, without converting the proceeding to one for summary judgment. *Id.* at 153 (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).

Finally, to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence that may be offered to support it. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Therefore, for purposes of Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's second claim for relief seeking declaratory judgment, the Court accepts as true all of the material allegations in the Complaint and draws all reasonable inferences in favor of Plaintiff. In determining the sufficiency of Plaintiff's second claim for relief, the Court also considers the Stand–Alone Plan, Disclosure Statement, Investment Agreement, Shareholder Stipulation, Confirmation Order, and other documents, which were incorporated by reference in the Complaint. Although not attached, or incorporated by reference, to the Complaint, the Court takes judicial notice of

the Shareholder Settlement Notice and related Summary Notice, the New York Final Order and Judgment, and the Shareholder Stipulation Approval Order in reviewing the sufficiency of Plaintiff's second claim for relief.

### 2. *Rule 56 Summary Judgment Standard Of Review*

Under Rule 56(a), "[a] party seeking . . . to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action . . ., move . . . for a summary judgment in the party's favor upon all or any part thereof." FED.R.CIV.P. 56(a). Rule 56(c) provides that a court must grant such a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material facts exists and that the undisputed facts establish [his or] her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). In determining whether the movant has met this burden, a court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001). If the movant carries this initial burden, the non-moving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. FED. R.CIV.P. 56(e); *see Matsushita Elec. In-*

*dus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A court must perform a two-part analysis to determine whether "there is no genuine issue as to any material fact." The first inquiry is whether the contested fact is material. Substantive law determines which fact is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* The existence of such a fact will preclude an entry of summary judgment. *Id.* Factual disputes that are irrelevant to the suit's outcome are to be disregarded. *Id.* The second determination is whether "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* If the fact may be reasonably resolved in favor of either party, then there is a genuine factual issue that may only be resolved by the trier of facts and summary judgment will be denied. *Id.* at 250, 106 S.Ct. 2505. If, however, the evidence "is so one-sided that one party must prevail as a matter of law," then summary judgment will be granted. *Id.* at 252, 106 S.Ct. 2505.

Pursuant to the Court's Local Rule 7056–1(b), Plaintiff annexed to its partial summary judgment motion a statement of the material facts (the "Plaintiff's Statement of Material Facts") as to which he contends there is no genuine issue to be tried. As part of its opposition brief to such motion and pursuant to Local Rule 7056–1(c), Defendants filed a statement of additional material facts (the "Defendants' Statement of Additional Material Facts"), contending that there are genuine issues to be tried.[19] Defendants' Statement of

---

**19.** Subsection (b) and (c) of this Court's Local Rule 7056–1 provides as follows:

Additional Material Facts only disputes paragraphs 19 and 22 of Plaintiff's Statement of Material Facts.[20] Since Defendants' responses to such paragraphs concern legal, not factual, issues (that is, the legal sufficiency of the Shareholder Stipulation Release), the Court finds that there is no "genuine issue as to any material fact" in dispute. Accordingly, the Court will determine under Rule 56(c) whether Plaintiff is "entitled to judgment as a matter of law."

## B. Section 16(b) Overview

█ Section 16(b) requires, among other things, that a statutory insider surrender to the issuer (that is, the corporation which issued the applicable equity security,

also known as the "issuing corporation") "any profit realized by him [or her] from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ..., irrespective of any intention on the part of such [statutory insider] in entering into such transaction...." 15 U.S.C. § 78p(b). The statute "imposes a form of strict liability on [statutory insiders], rendering them to disgorge profits even if they did not trade on inside information or intended to profit on the basis of such information." *Gollust v. Mendell*, 501 U.S. 115, 122, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991); *see Gwozdzinsky v. Zell/Chilmark Fund*, 156 F.3d 305, 310 (2d Cir. 1998) ("The statute, as written, establishes

(b) Upon any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit the statement shall constitute grounds for denial of the motion.

(c) Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried. Local Rule 7056–1(b)–(c).

**20.** Defendants' responses to paragraphs 19 and 22 of Plaintiff's Statement of Material Facts are as follow:

> *Mr. Rosenberg's Statement 19:* The Shareholder Stipulation discusses in detail the events and circumstances surrounding the Investor Agreement and the shareholder claims relating thereto, but does not in any way discuss, mention, or refer to the Section 16(b) Action or to any of the transactions upon which it is predicated.
>
> *Eagle River Defendants' Response:* Admit that the Shareholder Stipulation discusses in detail the events and circumstances sur-

rounding the Investor Agreement and the shareholder claims relating thereto, but object to the remainder of the statement because the Shareholder Stipulation releases all claims against the defendants in the N.Y. Shareholder Action (including Mr. McCaw) and their affiliates in exchange for a percentage of any cash recovery by XO against Forstman[n] or Telmex.

> ....
>
> *Mr. Rosenberg's Statement 22:* The notice also discusses in detail the events and circumstances surrounding the Investor Agreement and the shareholder claims relating thereto, but does not in any way discuss, mention, or refer to the Section 16(b) Action or to any of the transactions upon which it is predicated.
>
> *Eagle River Defendants' Response:* Admit that the notice discusses in detail the events and circumstances surrounding the Investor Agreement and the shareholder claims thereto, but object to the remainder of the statement because the Shareholder Stipulation releases all claims against the defendants in the N.Y. Shareholder Action (including Mr. McCaw) and their affiliates in exchange or a percentage of any cash recovery by XO against Forstman[n] or Telmex.

Defendants' Statement of Additional Material Facts at 5–6 (quoting Plaintiff's Statement of Material Facts, ¶ 19, 22) (citation, footnote, and bold emphasis omitted).

strict liability for all transactions that meet its mechanical requirements."). For purposes of Section 16(b)'s short-swing insider trading liability, a statutory insider is any "person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) ... or who is a director or an officer of the issuer of such security." 15 U.S.C. § 78p(a).

■ "As specified in its introductory clause, [Section] 16(b) was enacted 'for the purpose of preventing the unfair use of information which may have been obtained by [a statutory insider] ... by reason of his [or her] relationship to the issuer.'" *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (quoting 15 U.S.C. § 78p(b)). " 'Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors.'" *Gollust*, 501 U.S. at 121, 111 S.Ct. 2173 (quoting *Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976)). Congress further found that "short[-]swing speculation by stockholders with advance, inside information would threaten the goal of the ... Exchange Act to 'insure the maintenance of fair and honest markets.'" *Kern*, 411 U.S. at 591–92, 93 S.Ct. 1736 (quoting 15 U.S.C. § 78b). Accordingly, " 'the only method Congress deemed effective to curb the evils of [such] insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.'" *Id.* at 592, 93 S.Ct. 1736 (quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972)).

■ "Unlike most of the federal securities laws, [Section] 16(b) does not confer enforcement authority on the Securities and Exchange Commission." *Gollust*, 501 U.S. at 122, 111 S.Ct. 2173. Rather, a Section 16(b) cause of action seeking disgorgement of short-swing insider trading profits can be initiated by either the issuing corporation or the owner of any security (that is, the "security holder") of the issuing corporation and must be brought within two years of the date such short-swing profits were realized. 15 U.S.C. § 78p(b). If the issuing corporation (1) fails or refuses to bring a Section 16(b) cause of action within 60 days after a demand by a security holder, or (2) fails to diligently prosecute the action after bringing it, then the security holder may commence such an action in the name of and on behalf of the issuing corporation. *Id.* On the other hand, if an issuing corporation named as a nominal defendant in a Section 16(b) cause of action fears that a security holder who instituted the action will not diligently pursue it, public policy underlying Section 16(b) may allow a corporation to take over vigorous prosecution of the action. *Silverman v. Re*, 194 F.Supp. 540, 542 (S.D.N.Y.1961). While an issuing corporation may have a right to reacquire standing under such circumstances, this does not turn a Section 16(b) cause of action into a derivative action, as discussed in section II.D.3 of this opinion.

■ As to enforcement standing, the Supreme Court emphasized in *Gollust v. Mendell*, 501 U.S. 115, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991), that while Section 16(b) provides a narrow class of corporate insiders who may be defendants, the statute sets forth a broad class of plaintiffs, other than the issuer, who may have standing to bring suit. *Id.* at 122, 111 S.Ct. 2173. "The only textual restrictions on the standing of a party to bring suit

under [Section] 16(b) are that the plaintiff must be the 'owner of [a] security' of the 'issuer' at the time the suit is 'instituted.'" *Id.* at 122–23, 111 S.Ct. 2173 (quoting 15 U.S.C. § 78p(b)).

 Although a Section 16(b) plaintiff must be the owner of a "security" of the issuer, "[Section] 16(b) places no significant restriction on the type of security adequate to confer standing. '[A]ny security' will suffice, ... the statutory definition being broad enough to include stock, notes, warrants, bonds, debentures, puts, calls, and a variety of other financial instruments...." *Id.* at 123, 111 S.Ct. 2173. Moreover, "the terms of the statute do not even require that the security holder have had an interest in the issuer at the time of the defendant's short-swing trading, and the courts to have addressed this issue have held that a subsequent purchaser of the issuer's securities has standing to sue for prior short-swing trading." *Id.* Thus, unlike a typical derivative shareholder action under Rule 23.1 requiring, among other things, that the plaintiff was a shareholder at the time of the injurious transaction of which the plaintiff complains, a Section 16(b) plaintiff, such as Plaintiff herein, can obtain standing by purchasing a security of an issuer after the Section 16(b) alleged short-swing insider trading transactions.

 Further, neither the text of Section 16(b) nor its "legislative history reveal any congressional intent to impose" any "continuous ownership requirement." *Id.* at 124, 111 S.Ct. 2173. In other words, the statute does not require a security holder "to maintain ownership of the issuer's security throughout the period of his [or her] participation in the litigation." *Id.* Nevertheless, Section 16(b) does require that a "plaintiff [security holder] maintain a [continuing] financial interest in the outcome of the litigation sufficient to motivate its

prosecution and avoid constitutional standing difficulties." *Id.* at 127, 111 S.Ct. 2173. Specifically, "if a security holder were allowed to maintain a [Section] 16(b) action after he had lost any financial interest in its outcome, there would be serious constitutional doubt whether the plaintiff could demonstrate the standing required by Article III's case-or-controversy limitation on federal court jurisdiction." *Id.* at 125, 111 S.Ct. 2173.

In *Gollust*, less than six months after a plaintiff filed his Section 16(b) complaint, the issuing corporation underwent a certain merger, whereby the plaintiff subsequently received cash and stock in the parent corporation of the surviving subsidiary corporation, which was the former issuing corporation. *Id.* at 118–19, 111 S.Ct. 2173. The Supreme Court found that in the aftermath of the issuing corporation's restructuring, the plaintiff still retained a continuing financial interest in the outcome of the litigation derived from his stock in the parent corporation, whose only asset was the surviving subsidiary, and, therefore, the plaintiff still stood to profit, albeit indirectly, if his Section 16(b) cause of action was successful. *Id.* at 127–28, 111 S.Ct. 2173; *see generally DiLorenzo v. Edgar*, No. Civ. 03–841–SLR, 2004 WL 609374, at *3 (D.Del. Mar.24, 2004) (interpreting *Gollust* and finding that where a plaintiff has standing at the commencement of a Section 16(b) suit, "an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest in the outcome of the litigation.").

 Possibly upon the filing and certainly following the Effective Date of the Plan, XO common shareholders may not have had a continuing financial interest

sufficient to maintain a Section 16(b) cause of action, unless they exercised some right to acquire a financial interest through some other mechanism (such as purchase of a warrant provided for in the Plan). The Court nevertheless finds it unnecessary to reach this standing issue because Plaintiff as a bondholder under the Stand–Alone Plan received stock in the reorganized XO and thereby would have a continuing financial interest in the outcome of the Section 16(b) Action during the bankruptcy proceeding as well after the Effective Date. Having continued, as described above, to hold a financial interest Plaintiff has maintained his standing throughout the bankruptcy proceeding and thereafter. Furthermore, as to the standing issue raised by Defendants contending that Plaintiff did not have a continuing financial interest in the Section 16(b) Action because the action was released under the Debtor's Release, the Court finds that since the Debtor's Release is ineffective as to the Section 16(b) Action, as determined in section II.D.3 of this opinion, Defendants' standing concern is moot.

**C. *Section 29(a) And Goodman Matured–Claim Release Exception***

**1. *Plaintiff's Contentions***

Plaintiff contends that Section 29(a) of the Exchange Act [21] prohibits Defendants from being released from liability under his Section 16(b) Action because courts have (1) historically held under the statute that any attempt to waive or release a claim under the Exchange Act was void as a matter of law, and (2) continue to hold

that the statute invalidates releases of claims between parties that, in attempt to evade compliance with federal laws, are anticipatory waivers of compliance with the Exchange Act. Nevertheless, Plaintiff acknowledges that in *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978), the Seventh Circuit articulated an exception to Section 29(a), finding that "Section 29(a) . . . as interpreted by the courts, mandates that a purported release of claims under the federal securities law is valid only as to mature, ripened claims of which the releasing party had knowledge before signing the release." *Id.* at 402.

Irrespective of *Goodman,* Plaintiff asserts that courts have held that an issuing corporation's waiver or release of Section 16(b) claim, whether matured or not, was void under Section 29(a). Plaintiff also argues that no case has applied the *Goodman* matured-claim release exception to a matured Section 16(b) claim for it would directly conflict with congressional intent and strong public policy against such a release. Plaintiff contends, among other things, that since Section 16(b) is a prophylactic measure meant to prevent unconscionable dealings between the issuing corporation and its statutory insiders, a Section 16(b) claim cannot be waived or released by the issuing corporation that was under the control or influence of the violating statutory insiders. Plaintiff claims that such a policy concern is particularly resonant herein because the Plan was drafted and submitted by the Debtor while under the control of Defendants, where he did not have any role in drafting, submit-

---

**21.** Section 29(a) of the Exchange Act specifically provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc(a). While a release is not a waiver, it has been found that

"a release fits within the general language of Section 29(a) as a provision which purports to bind the signer to waiving the released's compliance with the provisions of the [1934 Securities and Exchange] Act." *Cohen v. Tenney Corp.,* 318 F.Supp. 280, 282 (S.D.N.Y. 1970).

ting or seeking confirmation of the Plan and the Plan Releases therein. Accordingly, Plaintiff asserts that permitting Defendants, through their control of the Debtor, to release Plaintiff's Section 16(b) Action, would be inconsistent with congressional intent and underlying public policy in enacting Section 16(b).

### 2. *Defendants' Contentions*

Since events alleged in the Section 16(b) Action took place in 2000, Defendants assert that Plaintiff's Section 16(b) claim was clearly a matured claim when Defendants' liability under the action was released in the Confirmation Order and the Shareholder Stipulation. Defendants argue that the *Goodman* matured-claim release exception to Section 29(a) does provide a basis for releasing them from liability under the Section 16(b) Action. While acknowledging that there is case law interpreting Section 29(a)'s bar on anticipatory waivers to also prohibit the release of any claims, Defendants claim that subsequent cases have rejected that interpretation and accepted that Section 29(a) permits the release of matured claims. Defendants note that in *Korn v. Franchard Corp.,* 388 F.Supp. 1326 (S.D.N.Y.1975), the court held that "Section 29(a) ... should not be construed to apply to the release of matured claims. To rule otherwise would foreclose the parties from settling matured claims and force every claimant to pursue the litigation to its costly conclusion.... This would not only constitute a blow to judicial economy, but to justice and common sense as well." *Id.* at 1329 (citations omitted).

Defendants also contend that Plaintiff's assertion that an issuing corporation is precluded from releasing a Section 16(b) claim is based on the fact that such a claim may not be waived by an issuing corporation or its statutory insiders. Regardless of this assertion, Defendants note that Plaintiff cannot maintain that the Claimants' Release is a release by the issuing corporation XO or one of its statutory insiders, that is, McCaw; rather, the Claimants' Release was a release of Defendants' Section 16(b) liability by XO's shareholders, including Plaintiff himself. (Although not asserted by Defendants, if the Claimants' Release were effective, it would also apply to Plaintiff in his capacity as a bondholder (creditor) because, in addition to the shareholders, creditors are also included within the definition of the Claimants under the Plan.)

Defendants also assert that contrary to Plaintiff's claim that there is strong policy behind Section 29(a) requiring that release of a Section 16(b) claim is void, this contention is erroneous because it is based on a misconception that Section 16(b) being a remedial statute whose effect may not be waived. Defendants note that section 10(b) of the Exchange Act, like Section 16(b), is a remedial statute that courts have interpreted broadly to effectuate its remedial purposes, but notwithstanding such purposes, have permitted release of matured section 10(b) claims.

### 3. *Analysis*

■ As an initial matter, Plaintiff's underlying premise regarding Section 29(a) is that the Defendant's release from any Section 16(b) liability under the Debtor's Release is not allowed under Section 29(a) and related case law,[22] and that the Claimants' Release fails to provide Defendants

---

**22.** In applying Section 29(a) to an issuing corporation's pre-litigation release of its former chairman from Section 16(b) liability claim, the district court in *Allied Artists Pic-* *tures Corp. v. Giroux,* 312 F.Supp. 450 (S.D.N.Y.1970) noted that "[a] corporation is prohibited by Section 29(a) of the ... Exchange Act ... from waiving compliance with

relief because it does not meet the *Goodman* exception's criteria to Section 29(a).[23] Certainly, the Debtor's Release, absent court approval process, would run afoul of Section 29(a) law in releasing Defendants from Section 16(b) liability and Defendants do not contest such a premise. However, since Plaintiff's contentions regarding cited Section 29(a) case law concern non-judicially reviewed releases and he has not shown Section 29(a) restrictions or standards are mandated in the context of court-approved releases, the Court finds that Plaintiff's has failed to establish that Section 29(a) is controlling law regarding the determination as to whether judicially-reviewed releases of a Section 16(b) action is effective.

In sum, since the Plan Releases were subject to this Court's approval process, the effectiveness of the Debtor's Release and the Claimants' Release depends upon principles discussed in subsections D.3 and E.3 in section II of this opinion, and not whether a release would be effective under Section 29(a) and the relevant case law applicable to non-judicially approved releases. Therefore, although the non-judicial limitation or process existing under Section 29(a) and the *Goodman* exception may provide guidance to a court in deciding whether to approve a release, such are not determinative of the validity of a court-approved release.

any of the provisions of the Act, including Section 16(b)...." *Id.* at 451 (citing *Jefferson Lake Sulphur Co. v. Walet*, 104 F.Supp. 20, 23 (E.D.La.1952), *aff'd*, 202 F.2d 433 (5th Cir.), *cert. denied*, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953); *Volk v. Zlotoff*, 285 F.Supp. 650 (S.D.N.Y.1968)). The district court in *Allied Artists* also noted that "[i]n accordance with the above sections, the [c]ourts have held that no matter what the resulting 'benefit' to actions asserted under Section 16(b) based on waiver, release or estoppel, are insufficient as a matter of law." *Id.* (citing *Magida v. Cont'l Can Co.*, 231 F.2d 843 (2d. Cir.), *cert. denied*, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956); *Volk v. Zlotoff, supra; Marquette Cement Mfg. Co. v. Andreas*, 239 F.Supp. 962 (S.D.N.Y.1965)); *see Synalloy Corp. v. Gray*, 816 F.Supp. 963, 969 (D.Del.1993) (finding that a corporation, in a pre-litigation release situation, may not effectively release, waive or settle otherwise cognizable claims under Section 16(b)); *see also Kay v. Scientex Corp.*, 719 F.2d 1009, 1014 (9th Cir.1983) (while not deciding on whether a corporation therein could waive its rights under Section 16(b) in a pre-litigation situation, the Ninth Circuit noted that other courts holding that a corporation may not waive its rights to recover short-swing profits under Section 16(b) is a "sensible" position "because otherwise wrongdoing insiders in control of a corporation could waive a corporation's [S]ection 16(b) rights to the detriment of 'outsiders.'") (citing *Allied Artists*, 312 F.Supp. at 451; *Volk*, 285 F.Supp. at 658; *Jefferson Lake*, 104 F.Supp. at 23–24).

**23.** As to the *Goodman* exception, this district recognizes that "[r]eleases of claims under the federal securities laws are valid 'as to mature, ripened claims of which the releasing party had knowledge before signing the release.'" *Lancer Offshore, Inc. v. Dominion Income Mgmt.*, No. 01–Civ. 4860, 2002 WL 441309, at *5 (S.D.N.Y. Mar.20, 2002) (quoting *Moseman v. Van Leer*, 263 F.3d 129, 133 (4th Cir.2001) (quoting, in turn, *Goodman v. Epstein*, 582 F.2d 388, 402 (7th Cir.1978))); *see Dresner v. Utility.com, Inc.*, 371 F.Supp.2d 476, 490 (S.D.N.Y.2005) ("Courts have held that Section 29(a) does not prohibit parties from executing valid releases in connection with securities fraud claims that have already matured."). Aside from a releasing party having "actual knowledge" of the existence of a matured, ripened claim prior to it being released, "knowledge" also includes that which the releasing party could have discovered upon reasonable inquiry. *See Goodman*, 582 F.2d at 403–04 (applying similar rationale of *Mittendorf v. J.R. Williston & Beane, Inc.*, 372 F.Supp. 821, 834 (S.D.N.Y.1974) and *Korn v. Franchard Corp.*, 388 F.Supp. 1326, 1332 (S.D.N.Y.1975)). Further, the releasing party must have affirmatively signed the release. *Id.* at 404 (requiring, among other things, that the releasing party, in obtaining knowledge of a matured claim, "undertake a 'reasonably inquiry' prior to taking the affirmative act of signing a release.").

### D. *Debtor's Release*

#### 1. *Plaintiff's Contentions*

Plaintiff argues that the Debtor's Release cannot legally extinguish his Section 16(b) Action because the release does not extend to a security holder's independent right to bring such an action. Plaintiff asserts that unlike a common law derivative suit, where a corporation can block a shareholder from pursuing a claim through the exercise of its business judgment, Section 16(b) provides a security holder both the right to demand the issuing corporation bring a Section 16(b) cause of action within 60 days and then an independent right to prosecute the action if the issuer fails to prosecute within 60 days or fails to prosecute the action diligently thereafter.

In support, Plaintiff asserts that in *Schaffer v. CC Investments, LDC*, 286 F.Supp.2d 279, 281–82 (S.D.N.Y.2003), the district court found, among other things, that a Section 16(b) cause of action is a primary right belonging to a security holder, not a right deriving from the corporation that would remain or revert to the corporation's estate upon filing of bankruptcy. Plaintiff contends that Congress gave any security holder the direct right to initiate a Section 16(b) cause of action because it recognized that an issuing corporation might be reluctant to sue its own officers and directors under the statute. Plaintiff therefore maintains that a security holder's independent right to sue is essential to implementing the public policies behind Section 16(b), that is, to protect security holders from statutory insiders who unfairly abuse their access to inside information in dealing with the issuing corporation's securities and to protect the integrity of the equity markets. Plaintiff claims that such policies behind a security holder Section 16(b) cause of action are so important that courts have held that even if a corporation settles the cause of action, a security holder is not precluded from commencing such an action. Moreover, Plaintiff argues to the extent the Debtor is deemed to have settled its Section 16(b) claim against Defendants, Plaintiff still maintains the right to prosecute the Section 16(b) Action against Defendants.

#### 2. *Defendants' Contentions*

Defendants argue that since the cause of action asserted in the Section 16(b) Action belonged to the Debtor and because the Debtor's Release extinguished the action against Defendants, Plaintiff is precluded from continuing to pursue his derivative claim. Contrary to Plaintiff's contention that a Section 16(b) cause of action is not a derivative or secondary action of the Debtor, Defendants assert that case law supports that the action is derivative. Although Plaintiff relies on *Schaffer* for his argument that a Section 16(b) cause of action is not derivative, Defendants contend that the court therein limited its holding to the question of whether the action is subject to the automatic stay under Bankruptcy Code section 362. Defendants note that the *Schaffer* court concluded that since a Section 16(b) cause of action "represents a potential source to augment the estate" it "is not affected by" the section 362 stay because the corporation will have no liability to claimant. Defendants thereby assert that as an asset of the Debtor's estate, the claim belongs to the Debtor. Therefore, Defendants argue that the Debtor can release them from liability under the Section 16(b) Action and Plaintiff is precluded from continuing to pursue the action. Further, Defendants contend that the Debtor's inability to recover from them due to the Debtor's Release deprives Plaintiff of any "financial interest" in the Section 16(b) Action and thus raises serious constitutional questions on whether

Plaintiff can demonstrate the requisite standing required by Article III's case-or-controversy limitation on federal court jurisdiction as noted in *Gollust.*

### 3. *Analysis*

██ A threshold issue in this case is whether liability under the Section 16(b) Action belonged to the Debtor, such that it was subject to the Debtor's Release. In order to make that determination, the Court must review whether the Section 16(b) Action is derivative in nature. A derivative cause of action has been consistently found to vest in the debtor upon the filing of its bankruptcy petition as property of the estate under section 541. The Court finds, as correctly suggested by Plaintiff, that *Schaffer* provides guidance on this issue.

In *Schaffer*, a shareholder brought a Section 16(b) suit against statutory-insider defendants seeking disgorgement of short-swing insider trading profits for the benefit of the issuing corporation. *Schaffer*, 286 F.Supp.2d at 280. Subsequently, the issuing corporation filed for bankruptcy in Florida and, as a result, the defendants argued that all further Section 16(b) district court proceedings against them in New York should be automatically stayed pursuant to Bankruptcy Code section 362. *Id.* The plaintiff countered that such a stay is inapplicable because a Section 16(b) cause of action does not involve property of the issuer-debtor, which was named in the suit only as a nominal defendant. *Id.*

The *Schaffer* court noted that "Section 362(a) provides in pertinent part that 'a petition filed under section 301, 302 or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.' " *Id.* at 280–81 (quoting 11 U.S.C. § 362(a)(3)).

The district court further noted that the key phrase of Bankruptcy Code section 362(a)(3) for purposes of resolving the matter before it was "property of the estate," which is defined in Bankruptcy Code section 541 "as including 'all legal or equitable interests of the debtor in property as of the commencement of the case.' " *Id.* at 281 (quoting 11 U.S.C. §§ 362(a)(3), 541(a)(1)). In particular, the district court noted that "[i]n connection with [section] 362, federal courts have interpreted [section] 541 'to prevent individual shareholders and creditors from suing to enforce a right of the corporation when that corporation is in bankruptcy,' thus leaving such rights to be vindicated by the bankruptcy trustee." *Id.* (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir.1986)). On the other hand, the district court found that " 'the stay does not apply to suits brought to recover rights of action which belong to the plaintiff-creditor.' " *Id.* (quoting *Kommanditselskab Supertrans v. O.C.C. Shipping, Inc.*, 79 B.R. 534, 540 (S.D.N.Y.1987) (citing, in turn, *Cumberland Oil*, 791 F.2d at 1042)). Following the rationale of *Kommanditselskab*, the district court reasoned that if the plaintiff were suing to recover on a right of action belonging to the debtor corporation, the automatic stay would operate, whereas if the plaintiff were suing to recover on a right of action belonging to the plaintiff personally, the stay would not apply.

The *Schaffer* court held that the Section 16(b) cause of action was not property of the bankruptcy estate under Bankruptcy Code section 541 and, therefore, the action did not belong to the estate, but primarily belongs to the plaintiff security holder therein. *Id.* at 282–83. Accordingly, the district court found that the Section 16(b) suit was not subject to the automatic stay under Bankruptcy Code section 362. *Id.* In particular, the district

court first determined that "the right to sue under [Section] 16(b) is [the security holder's] primary right created by statute, not a derivative right emanating from interests of the corporation which would then remain with or revert to the corporation's estate upon bankruptcy." *Id.* at 282. Second, the district court found that the "action . . . is unlikely to result in a potential call upon the property of the estate because such a suit is brought against the corporation's insiders to disgorge illicit profits from their private trading in the issuer's shares." *Id.* at 282–83. Rather, the district court noted that "because the lawsuit is privately prosecuted on behalf of the corporation, the [Section] 16(b) action represents a potential source to augment the estate to the benefit of all its creditors, at no expense to it." *Id.* at 283. Third, the district court provided that delaying enforcement of the section 16(b) action based on general public concerns underlying Bankruptcy Code section 362's automatic stay is not warranted because "the public policy reasons underlying [Section] 16(b) favor enforcement to protect . . . the interests of the general public in full disclosure and honest dealing in transactions involving corporate insiders that may affect the value of investments in the corporation's shares and the integrity of the securities markets." *Id.* Fourth, the district court recognized that Bankruptcy Code "[section] 362 embodies federal statutory poli-

cy that, absent explicit provisions in other federal law, presumptively operates to encompass within the debtor's estate and the jurisdiction of the bankruptcy court property deriving from common law rights of the debtor." *Id.* However, the district court reasoned that insofar as Section 16(b)'s "enforcement right . . . is grounded on an independent Congressional mandate, it should not be automatically extinguished by application of a conflicting federal policy without an explicit or compelling expression by Congress that in fact such adjustment of the clashing statutory interests involved represents its intent." *Id.* The district court did not find "such a clear and unambiguous statement of Congressional purpose in either the Bankruptcy Code or in the [Exchange] Act." *Id.*

The *Schaffer* court did acknowledge that "[m]any courts have ruled that the bankruptcy estate includes derivative actions brought by shareholders, and thus '[a] corporation's filing for bankruptcy cuts off a shareholder's ability to bring a derivative claim.' " *Id.* (quoting *In re Gen. Dev. Corp.*, 179 B.R. 335, 338 (S.D.Fla.1995)). The district court found that "although some courts use the term 'derivative' to describe [Section] 16(b) lawsuits, under the pure application of the [derivative] concept, a [Section] 16(b) action is not a derivative action in the way that a typical shareholder derivative action is." [24] *Id.* (citing

---

**24.** While the Second Circuit has used the term "derivative" to describe a Section 16(b) action, *see Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co.*, 340 F.3d 79, 80 (2d Cir. 2003) ("The [Section 16(b)] suit was brought by a stockholder of Egghead.com, Inc . . . . as a derivative action for the benefit of the corporation. . . ."), *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir.2002) ("The issuing corporation or, derivatively, a shareholder is entitled to maintain [a Section 16(b)] action seeking to have the profit disgorged to the corporation."), *Gryl v. Shire*

*Pharm. Group PLC*, 298 F.3d 136, 139 (2d Cir.2002) ("This derivative suit is actionable pursuant to Section 16(b). . . ."), *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 11 (2d Cir.2001) (noting that a shareholder of the issuer brought a "shareholder derivative action" pursuant to Section 16(b)), *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.2001) ("Morales, a Quintel shareholder, brought this shareholder derivative suit pursuant to [Section] 16(b). . . ."), *Feder v. Frost*, 220 F.3d 29, 30 (2d Cir.2000) (noting that a

*Dottenheim v. Murchison*, 227 F.2d 737, 738 (5th Cir.1955) ("[Section 16(b)] creates a new cause of action, which, while similar in some respects to a secondary or derivative right, is not such a right at all."); and citing *Blau v. Oppenheim*, 250 F.Supp. 881, 885 (S.D.N.Y.1966) ("Preliminarily it should be emphasized that strictly speaking a[S]ection 16(b) suit to recover short-swing profits is not derivative, although some of the cases so describe it.")); *but see Abrams v. Occidental Petroleum Corp.*, 47 F.R.D. 301, 308 (S.D.N.Y.1969) ("Of course, every Section 16(b) claim belongs to the corporation and, when asserted by a stockholder, is a secondary or derivative action."). The district court reasoned that although there are similarities between a Section 16(b) cause of action and a traditional shareholder derivative action, "a [Section] 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law." *Schaffer*, 286 F.Supp.2d at 282; *see generally* ARNOLD S. JACOBS, SECTION 16 OF THE SECURITIES EXCHANGE ACT § 3:1, 3–12 (West July 2003) (hereinafter "JACOBS, SECTION 16") ("While [a Section 16(b)] cause of action has some attributes of a derivative suit (for instance, a security holder can sue and the recovery flows to the corporation), the cause of action is not derivative at all; rather, it is one possessing an independent statutory origin."). Further, the district court clarified that a Section 16(b) cause of action "amounts to an *enforcement* right," enabling the issuing corporation to gain from the redistribution of the statutory insiders' illicit short-swing profits of which such corporation has no similar recovery right under common law causes of action. *Schaffer*, 286 F.Supp.2d at 282 (emphasis

shareholder of the issuer "brought the [Section 16(b)] suit derivatively on its behalf."), and *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 307–08 (2d Cir.1998) (noting that the plaintiff security holder "filed a derivative action" and that a Section 16(b) cause of action "can be maintained either by the company or derivatively by a shareholder."), and it has observed in *Magida v. Cont'l Can Co.*, 231 F.2d 843 (2d Cir.1956), that "[t]he action under [Section] 16(b) is derivative in the sense that the corporation is the instrument ...," *id.* at 846, the Second Circuit has not specifically reviewed the application of the derivative action concepts to a Section 16(b) cause of action to determine the nature of the action as an "enforcement right." *See generally* JACOBS, SECTION 16, § 3:35, 3–290 (noting while certain cases refer to a Section 16(b) suit as a derivative suit, any case that has analyzed the issue has "conclude[d] that a Section 16(b) suit is not a derivative action."). However, the Second Circuit has recognized that "[t]he standing requirements for shareholder derivative suits" under Rule 23.1 of the Federal Rules of Civil Procedure "are not applicable to a [Section] 16(b) plaintiff." *Mendell v. Gollust*, 909 F.2d 724, 728 (2d Cir.1990).

Additionally, although the district court in *Schaffer v. CC Investments, LDC*, 286 F.Supp.2d 279, 281–83 (S.D.N.Y.2003), found that a Section 16(b) cause of action is not "derivative" in determining the action is not property of the estate under Bankruptcy Code section 541 and thus the automatic stay under Bankruptcy Code section 362(a)(3) is inapplicable, the court subsequently noted in *Schaffer v. CC Investments, LDC*, No. 99 Civ. 2821, [2003 WL 22480052, at *1,] 2003 WL 22480052, at *1 n. 1 (S.D.N.Y. Oct. 31, 2003), that Schaffer's Section 16(b) cause of action is a "derivative action," which is similar to its earlier notations in *Schaffer v. CC Investments, LDC*, No. 99 Civ. 2821, 2002 WL 31869391, at *1 n. 1 (S.D.N.Y. Dec.20, 2002), and in 280 F.Supp.2d 128, 130 n. 1 (S.D.N.Y. 2003) (both cases noting plaintiff security holder's section 16(b) suit as a "derivative action"). It appears that references to phrase "derivative action" in these cases, as in the circuit cases cited above, are generally descriptive and not germane to the issues decided therein, and not a finding, in any event, as to the nature of a Section 16(b) cause of action for purposes of enforcement.

in original). Additionally, the district court noted, "as reflected in the plain language of the statute, [Section] 16(b) was enacted because of the 'national public interest which makes it necessary to provide for regulation and control of such transactions.'" *Id.* at 282 (quoting 15 U.S.C. § 78b).

The Court agrees with the *Schaffer* court's holding that the action is not derivative for purposes of application of Bankruptcy Code section 362(a)(3). Although Defendants are correct in that the *Schaffer* court's holding may be limited to the application of the automatic stay under Bankruptcy Code section 362(a)(3); in reaching that holding, the court determined that the Section 16(b) cause of action was not property of the estate under section 541. Further, as stated above, the basis of that finding is that the action is not derivative. It is not a right that is secondary or derivative from that of the corporation, but is a statutory enabling right directly empowering an issuer's security holder to sue.

Additionally, the conclusion that the Section 16(b) Action does not belong to the Debtor is supported by the fact that after Plaintiff's June 21, 2000 demand letter, the Debtor declined in an August 14, 2000 response letter to pursue the action. Instead, Plaintiff retained his right to institute the action and, upon refusal of the Debtor, commenced it in less than 60 days of his demand, that is, on August 29, 2000.[25] *See generally* JACOBS, SECTION 16 § 3:37, 3–313 ("[T]he [security] holder can commence an action 'if the issuer shall . . . refuse to bring such suit within 60 days after request.' Thus, the [security] holder can start a Section 16(b) [cause of] action less than sixty days after the demand as long as the issuer has refused (as distinguished from failed) to sue."). Moreover, a Section 16(b) cause of action brought by a security holder after an issuing corporation refuses upon demand to pursue the action does not simply revert to the corporation's estate upon its filing of bankruptcy.[26] *See generally Schaffer*, 286 F.Supp.2d at 282 (as mentioned previously, a security holder's right to sue under Section 16(b) is a "primary right created by statute, not a derivative right emanating from interests of the corporation which

**25.** Indeed, "[i]t is . . . the security holders of an issuer who have the ultimate authority to sue for enforcement of a Section 16(b)," *Gollust*, 501 U.S. at 122, 111 S.Ct. 2173, because, among other things, "Congress was aware that corporate officers or directors might well be reluctant to sue a fellow officer or director or an important stockholder," *Fistel v. Christman*, 133 F.Supp. 300, 304 (S.D.N.Y.1955).

**26.** The Court recognizes that the district court in *Silverman v. Re*, 194 F.Supp. 540, 542 (S.D.N.Y.1961), found that since the security holder who instituted a Section 16(b) suit was possibly not diligent in pursing the action, the public policies upon which Section 16(b) is based enables an issuing corporation to move to be renamed from a nominal party defendant to a party plaintiff. Thus, the district court found that the issuing corporation had the right to take over the prosecution of the Section 16(b) suit even after initially refusing the security holder's demand to pursue the action (such is assumed based on the nominal party defendant status of the issuing corporation and a security holder as a plaintiff) and the two-year statute of limitations under Section 16(b) had passed. While arguably the Debtor under *Silverman* could take over prosecution of the Section 16(b) Action if certain conditions existed, no such request was ever made or is sought by the Debtor. A debtor's ability to prosecute the action under *Silverman* would not change the non-derivative nature of the Section 16(b) cause of action for in *Silverman* the basis upon which the corporation took over the action stemmed from public policy considerations and not that the shareholder's right to enforce the action was derived from the corporation's right to enforce such action. In essence, the statutory right of the security holder to commence a Section 16(b) cause of action is not derivative of any right of the corporation.

would then remain with or revert to the corporation's estate upon bankruptcy."). Therefore, the Court finds that although under Section 541 the proceeds, or right thereto, of the Section 16(b) Action are property of the estate, the cause of action itself is not property of the estate.

Since the Section 16(b) Action is not a cause of action that belongs to the estate, the Court finds that the Debtor did not have any "right" to release that action under the Debtor's Release. Arguably, at most, the Debtor may have released was any right it might have had to seek to take over the Section 16(b) Action under the public policy rationale, as previously discussed, of *Silverman v. Re*, 194 F.Supp. 540, 542 (S.D.N.Y.1961). However, that issue does not need to be reached, herein, by the Court.

■ Although the Court agrees with the *Schaffer* court that a Section 16(b) cause of action is not derivative and thus not "property of the estate" pursuant to Bankruptcy Code section 541, the Court believes that the stay could be implicated under Bankruptcy Code section 362(a) because of, among other things, (1) the status of a debtor as a nominal defendant under section 362(a)(1), or (2) a debtor's interest in the potential proceeds from the action,

under section 362(a)(3). Further, under Bankruptcy Code section 105(a), the potential impact that a Section 16(b) action may have on the administration of the estate could warrant a stay of such action. However, regarding the instant case, to the extent the stay or injunction under the Plan would limit the prosecution of the Section 16(b) Action, the Debtor has not raised that issue and has in fact supported the continuation of the Section 16(b) Action. Therefore, the Court finds that Plaintiff, assuming the Section 16(b) Action is not released, would not have to seek relief from the automatic stay as continued under the Plan or the Plan Injunctions before continuing the action.[27]

Based upon the foregoing, the Court concludes that Plaintiff is entitled to summary judgment as a matter of law that the Debtor's Release is inapplicable to his Section 16(b) Action because the action is not property of the Debtor's estate and thus the Debtor did not have a right to release the action.

### E. *Claimants' Release, Plan Discharge, And Plan Injunctions*

#### 1. *Plaintiff's Contentions*

Plaintiff argues that the Claimants' Release does not release Defendants from

---

**27.** The Court also notes that the public interest concern over the issuing corporation colluding with statutory insiders is not generally present once such corporation files for bankruptcy because the actions of the debtor corporation are subject to review of a bankruptcy court. Further, arguably it may be appropriate for the debtor corporation to take over a Section 16(b) cause of action because, upon its filing, the presumption of insolvency puts at issue the standing of a plaintiff security holder under such an action. However, under the very same presumption of insolvency, each creditor or the creditors' committee on behalf of the creditors could argue "financial interest" standing and seek to take over the action as well. In sum, it does not follow that the issuing corporation's filing of bankruptcy

vests a Section 16(b) cause of action in a debtor corporation as property of the estate under section 541. Such an action arguably could remain with the Plaintiff, be taken over by a creditor or creditor's committee on behalf of creditors, or, under the *Silverman* rationale, as discussed earlier in section II.B of this opinion, be taken over the debtor corporation. The fact that a debtor may establish a basis to take over the action under *Silverman* rationale would stem from a concern over diligent prosecution and not based upon a property of the estate theory, as previously discussed in the body of the this opinion, which supports the vesting of a derivative action in the debtor upon its bankruptcy filing.

liability under the Section 16(b) Action because it contains qualifying language, applying only "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date." Since fundamental rules of contract interpretation apply to bankruptcy orders and because the Claimants' Release is part of the Confirmation Order, Plaintiff contends that such release is subject to the rules governing contract interpretation. Under these rules, Plaintiff maintains that words and phrases should be given their plain meaning and the intent of the parties governs. Plaintiff asserts that the plain meaning of the initial clause, "permissible under applicable law," clearly provides that it is only valid to the extent permitted under applicable law and the phrase is also tacit acknowledgment that there may be no legal authority for such a release. Further, as to the second clause, "as such law may be extended or interpreted subsequent to the Effective Date," Plaintiff claims that the law has not changed since the Effective Date, that is, the Claimants' Release is still invalid as a matter of law. Plaintiff also asserts that the Debtor concedes in its pleadings that the Claimants' Release was not intended to and has not released Defendants from liability under the Section 16(b) Action.

In terms of "applicable law" limiting the Claimants' Release, Plaintiff refers to JA-COBS, SECTION 16, which states "[a] court must approve the settlement of a Section 16(b) case." *Id.* at § 3:50, 3–330. For support, Plaintiff maintains that the district courts in *Olin v. Ginsberg*, No. 68 Civ. 3305, 1970 WL 209, at *1 (S.D.N.Y. Nov.2, 1970), and in *Lewis v. Rosenberg*, Civ. No. 120–12, 1958 U.S. Dist. LEXIS 4187, at *1 (S.D.N.Y. Apr. 11, 1958), held that a settlement of a Section 16(b) cause of action by a security holder, which by its very nature involves a release of some portion of a statutory insider's liability, requires that a

court determine whether the proposed settlement or release is fair, adequate, proper, and in the best interests of all concerned parties.

Plaintiff points out that neither this Court nor the Delaware District Court conducted a fairness and adequacy determination for releasing Defendants' liability under the Section 16(b) Action. Further, Plaintiff contends that the Disclosure Statement filed in connection with the Plan, which was drafted and submitted by the Debtor while under the control of Defendants, failed to disclose the existence of the Section 16(b) Action and thus it cannot be said that this Court had a true opportunity to determine the fairness of releasing the action under the Claimants' Release. Plaintiff also contends that the Claimants' Release cannot be said to be fair, adequate or reasonable because it settled Defendants' Section 16(b) liability without consideration, whereas most cases involving court approval of a Section 16(b) settlement had some form of consideration from a statutory insider in exchange for a release from liability. Moreover, regardless of the Claimants' Release, Plaintiff claims that a security holder who initiates a Section 16(b) cause of action cannot simply release a statutory insider from liability on his or her own because this would nullify the entire purpose of the statute. Plaintiff hypothesizes that any statutory insider who is subject to Section 16(b) liability could offer the plaintiff security holder an incentive to provide a release in exchange for personal profit to the detriment of the issuing corporation, the public, and the markets. Instead, Plaintiff maintains that a district court, not a bankruptcy court, is required to hear the settlement and determine its fairness before a statutory insider can be released from Section 16(b) liability. Plaintiff emphasizes that it has not been determined that a bankruptcy court even

has jurisdiction to adjudicate a Section 16(b) cause of action.

Plaintiff also contends that the Plan Discharge does not bar his Section 16(b) Action because the action is not a liability of the Debtor; rather, it is an asset of reorganized XO. Plaintiff asserts that a Section 16(b) cause of action commenced by a security holder is brought for the benefit of the issuing corporation and that it is only as a formality, in accordance with Section 16(b) law, that the issuing corporation or debtor-issuing corporation is named as a nominal defendant in a Section 16(b) complaint. Here, Plaintiff contends that the Section 16(b) Action is not against the Debtor, but against the statutory insiders, that is, Defendants McCaw and Eagle River. Furthermore, as discussed above, even if an issuer's Section 16(b) cause of action is eliminated through a plan discharge, it would not affect a security holder's independent statutory right to bring the action.

In addition, Plaintiff argues that Bankruptcy Code section 524(e) clarifies that the bankruptcy discharge of a debtor alone does not relieve nondebtors of their liabilities, including Section 16(b) liability. Plaintiff contends that with the exception of Bankruptcy Code section 524(g) providing for a procedure for resolving asbestos claims, the Bankruptcy Code does not explicitly authorize the release of claims against nondebtors. While recognizing that the Second Circuit in *Securities & Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir.1992) has adopted a less stringent approach to nondebtor releases and permanent injunctions has allowed such releases and injunctions only where such a step was essential to confirmation of the Plan, Plaintiff claims that this approach is not a source for unlimited discretion to discharge nondebtors of their liabilities.

Quoting *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D.Mo.1994), Plaintiff contends that enjoining a third party from pursuing nondebtor liability is "a rare thing" that should not be considered without "a showing of exceptional circumstances." *Id.* at 937. Plaintiff asserts, for instance, that in cases where this Court upheld plans of reorganization containing nondebtor releases and permanent injunctions, the plans also provided consideration to parties who would be enjoined from suing the nondebtors. Also, Plaintiff contends that courts in other circuits have held a plan provision releasing liabilities of nondebtors to be unfair where the plan did not provide additional compensation to a creditor whose claim against the nondebtor was released. In this matter, Plaintiff claims that no such consideration was provided for or disclosed in the Plan, nor are any other exceptional circumstances present warranting any Defendants' release from Section 16(b) liability. Although the court in *Master Mortgage* held that nondebtor releases may be allowed where "[t]here is an identity of interest between the debtor and the third party, usually an indemnity relationship," *see Master Mortgage*, 168 B.R. at 935, Plaintiff also points out that no such identity of interest exists here considering as a matter of law and policy the Debtor cannot indemnify McCaw for the cost of defending the Section 16(b) Action brought against him or for any monies that he may be liable for as a consequence of the action.

Further, Plaintiff argues that while courts have relied on Bankruptcy Code section 105(a) in upholding nondebtor releases and permanent injunctions that are essential to the plan of reorganization, releasing the Section 16(b) Action was in no

way essential to the Plan. Plaintiff claims that the Debtor did not receive any asset from McCaw in exchange for the purported release nor did McCaw continue to serve as an officer or director of the reorganized XO. Similarly, although the Court found in the Confirmation Order that each nondebtor party that will benefit from the Plan Releases and Plan Injunctions shares an identity of interest with the Debtor and has provided substantial consideration to the Debtor's reorganization, Plaintiff argues this finding has no bearing on the Section 16(b) Action because, as noted, McCaw has provided no consideration or continued employment to the Debtor. Plaintiff contends that even if the Court finds that exceptional circumstances are present in this case and that the release of the nondebtor Defendants was essential to the reorganization of XO, a Section 16(b) suit cannot be released without the statutory insiders providing consideration, which did not occur herein. Plaintiff also asserts that while the Claimants' Release settled the Section 16(b) Action for no consideration from Defendants, many courts have refused to approve a settlement of a Section 16(b) suit for less that the full amount of the potential recoverable profit because any lower settlement would negate Section 16(b)'s legislative purpose.

### 2. *Defendants' Contentions*

Although Plaintiff asserts that the Claimants' Release is qualified by the phrase "to the fullest extent permissible under applicable law," Defendants claim that Plaintiff ignores the second clause of the phrase, that is, "as such law may be extended or interpreted subsequent to the Effective Date." Defendants contend that this phrase, when taken as a whole with the remainder of the Claimants' Release language, clearly ensures that the Claimants' Release is given the broadest possible interpretation available under applicable law. By analogy with contract law interpretation, Defendants claim, without greater specificity, that an interpretation that gives a reasonable and effective meaning to all terms of the contract, such as the language of Claimants' Release in relation to the Plan, would generally be preferred over one that leaves a part of the Plan unreasonable or with no effect. Defendants thereby urge the Court, without clarification, not to read unwritten limitations into the broad language of the Claimants' Release.

Defendants also assert that although Plaintiff contends that the Debtor stated in its Rule 12(b)(6) motion to dismiss the Complaint's first claim for relief that it did not intend to release Defendants' Section 16(b) liability in the New York Shareholder Action or under the Plan, the Claimants' Release appears in the Confirmation Order and unambiguously releases such liability. Defendants therefore argue that there is no basis for utilizing parol evidence, such as the "intent" of the Debtor, to contradict the unambiguous terms of the Claimants' Release. Further, Defendants claim the Complaint alleges that the Debtor specifically intended to release Defendants' Section 16(b) liability and thereby the Court must accept this allegation as true for purposes of Defendants' Rule 12(b)(6) motion.

Defendants also contend that while Plaintiff suggests that Section 16(b) requires that the Court make a fairness and adequacy determination regarding the Claimants' Release, such a determination is not substantively required under Section 16(b) or any other section of the securities law. Rather, Defendants maintain that the determination is a procedural rule that stems from Rule 23.1 concerning derivative actions by shareholders, however, a bankruptcy court need not apply all the

Federal Rules of Civil Procedure that might apply to all potential claims in all potential courts. Further, Defendants assert that the Court has already made a similar fairness determination in the Confirmation Order. Defendants argue that this determination in the Confirmation Order already meets the standard that Plaintiff suggests is required.

In addition, while Plaintiff suggests that the Court was not made aware of his Section 16(b) Action, Defendants contend that Plaintiff had due notice of the Plan Releases prior to Plan confirmation and could have or should have objected to the releases before confirmation, but neglected to object to the releases. Defendants thereby argue that Plaintiff is precluded from collaterally attacking the releases six months after confirmation and substantially consummation of the Stand–Alone Plan. Instead, Defendants assert Plaintiff is now bound by the terms of the Confirmation Order, where entry of the order is an event similar to entry of a final judgment in ordinary civil litigation and, once the Plan has been confirmed, it binds the Debtor and all of its creditors to its provisions, and it has preclusive effect, including precluding all post-confirmation litigation that is subject to the Plan Injunctions in favor of the Debtor's officers and directors.

Defendants assert that the Plan Discharge explicitly precludes his Section 16(b) Action. Defendants argue that since Plaintiff may not recover directly under Section 16(b) and because the Debtor cannot recover from Defendants because they were released under the Debtor's Release, there is no longer a case or controversy and thus the Complaint should be dismissed.

Furthermore, Defendants contend that while Plaintiff asserts in his Complaint that the Claimants' Release cannot validly release Defendants from liability under the Section 16(b) Action because they allegedly did not provide consideration to Plaintiff for the release, this assertion is irrelevant in the Second Circuit. Although a possible applicable provision to Plaintiff's assertion is Bankruptcy Code section 524(e), Defendants claim that the Second Circuit in *Drexel,* 960 F.2d at 293, found that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." *Id.* Defendants argue that where a nondebtor releases and related permanent injunctions are determined to be central to a debtor's reorganization, Bankruptcy Code section 105 vests a bankruptcy court with the inherent power to release nondebtors and enjoin any person from asserting future claims against such a release. Defendants also note that the Confirmation Order determined that the Plan Releases and Plan Injunctions in favor of the Debtor's officers and directors were central to the Debtor's reorganization. Additionally, Defendants assert that although Plaintiff cites case law outside of the Second Circuit that provides only that a creditor who releases his claim should obtain consideration, such case law does not stand for the proposition that each and every released party must provide consideration commensurate to its potential liability. Further, Defendants contend that Plaintiff did not deny receiving consideration in exchange for the Claimants' Release.

### 3. *Analysis*

#### a. *Structure Of Claimants' Release*

The Claimants' Release under the Stand–Alone Plan provides for consensual and nonconsensual releases. First, the Claimants' Release provides a release based on "each Holder of a Claim or Interest [who] voted to accept the Plan," Plan

§ 10.4(b)(ii)(i), that is, a consensual release based upon casting one's vote in favor of the Plan. In addition, if a claimant did not vote for the Plan, the Claimants' Release provides a nonconsensual release applicable "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date," for (a) "all Holders of Claims and Interests, in consideration for obligations of the Debtor and Reorganized XO under th[e] Plan, and the Warrants, New Reorganization Common Stock and other contracts, instruments, releases, agreements or documents executed and delivered in connection with th[e] Plan," and (b) "each entity (other than the Debtor) that has held, holds or may hold a Claim or Interest, as applicable." Plan § 10.4(b)(ii)(ii). Since shareholders, including Plaintiff, did not vote and were deemed to have rejected the Plan and because there is no record that Plaintiff in his capacity as a bondholder voted for the Plan, the Court finds that the nonconsensual provision of the Claimants' Release applies to the Section 16(b) Action; however, as previously discussed, this nonconsensual release only applies "to the fullest extent permissible under applicable law...." Plan § 10.4(b)(ii)(ii).

### b. *Nonconsensual Nondebtor Releases And Permanent Injunctions*

As to the term "to the extent permissible under applicable law" of Section 10.4(b)(ii)(ii) of the Claimants' Release, the Court finds that this term requires a determination of the scope of the release at issue if a nondebtor party seeks to enforce such release either (i) in a court where the action allegedly covered by such release is commenced or continued, or (ii) before this Court, as is the case herein. The Court finds that the scope of the aforementioned term of the Claimants' Release must be

reviewed under "applicable law" based upon the record of the Court's confirmation related findings to determine whether such findings support, as a matter of law, release of Defendants' liability, if any, under the Section 16(b) Action and thereby warrant enjoining Plaintiff under the Plan Injunctions from further pursuing the action against Defendants. Thus, the appropriate inquiry is whether this Court had authority under applicable law to grant a nonconsensual nondebtor release from liability under a Section 16(b) action.

Recently, the Second Circuit in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir.2005) (*"Metromedia"*), clarified its previous holding in *Drexel* where it "held that '[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.'" *Id.* at 141 (quoting *Drexel*, 960 F.2d at 293). The Second Circuit in *Metromedia* explained that "[w]hile none of our cases explains when a nondebtor release is 'important' to a debtor's plan, it is clear that such a release is proper only in rare cases." *Id.* (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir.2002) ("[S]uch an injunction is a dramatic measure to be used cautiously...."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212–13 (3d Cir.2000) (recognizing that nondebtor releases have been approved only in "extraordinary cases")).

The Second Circuit further explained that "[a]t least two considerations justify the reluctance to approve nondebtor releases. First, the only explicit authorization in the Code for nondebtor releases is [Bankruptcy Code section] 524(g), which authorizes releases in asbestos cases when

specified conditions are satisfied, including the creation of a trust to satisfy future claims." *Id.* at 142. Although recognizing that Bankruptcy Code section "105(a) authorizes the bankruptcy court to 'to issue any order process or judgment that is necessary or appropriate to carry out provisions of [the [Bankruptcy] Code],'" the Second Circuit found that "section 105(a) does not allow the bankruptcy court 'to create substantive rights that are otherwise unavailable under applicable law.'" *Id.* (quoting *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir.2003)); *see Smart World Technologies, LLC v. Juno Online Servs., Inc. (In re Smart World Technologies, LLC)*, No. 04–3497, 2005 WL 2197676, at *14, 423 F.3d 166, 183 (2d Cir.Sept. 12, 2005) (similarly citing *Dairy Mart* and noting that "[section] 105(a)'s equitable scope is plainly limited by the provisions of the [Bankruptcy] Code.").

Regarding the second consideration in *Metromedia* justifying reluctance to approve nondebtor releases, the Second Circuit held that "a nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release, in effect, that may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Metromedia*, 416 F.3d at 142. The Second Circuit also emphasized that "[t]he potential for abuse is heightened when releases afford blanket immunity." *Id.*

 In determining that the Bankruptcy Court's finding was insufficient (but not remanding such insufficient finding because it found the appeal was equitably moot), the Second Circuit in *Metromedia* concluded that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release

terms important to success of the plan, focusing on the considerations discussed" previously in its opinion. *Id.* at 143 (comparing its conclusion to the holding in *Dow Corning*, 280 F.3d at 658, which requires a bankruptcy court to make "specific factual findings that support its conclusions" before approving nondebtor releases). As to such considerations, the Second Circuit noted that "[c]ourts have approved nondebtor releases when:" (1) "the estate received substantial consideration," citing *Drexel*, 960 F.2d at 293, (2) "the enjoined claims were 'channeled' to a settlement fund rather than extinguished," citing *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93–94 (2d Cir.1988), and *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 701 (4th Cir.1989), (3) "the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution,'" quoting *A.H. Robins, supra,* and (4) "the plan otherwise provided for the full payment of the enjoined claims," citing *A.H. Robins, supra. Metromedia*, 416 F.3d at 142. The Second Circuit also noted that "[n]ondebtor releases may also be tolerated if the affected creditors consent." *Id.* (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir.1993)).

However, the Second Circuit cautioned in *Metromedia* that "this is not a matter of factors and prongs. No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique." *Id.* at 142–43 (citing *Dow Corning*, 280 F.3d at 658; *Cont'l Airlines*, 203 F.3d at 212–13; *Drexel Burnham*, 960 F.2d at 288–93).

As previously noted, in confirming the Plan, the Court found that (1) each nondebtor party that will benefit from the Plan Releases, waiver of claims, and Plan Injunctions, shares an identity of interest

with the Debtor, and has contributed substantial assets to the Debtor's reorganization, where such contributions will provide for certain distributions that would not have been made available but for these nondebtor parties' contributions, (2) such releases, waivers and injunctions were essential to the Plan, and (3) one of the impacted classes voted to accept the Plan. McCaw, who was a defendant in the New York Shareholder Action, provided his consent, along with other defendants in the action, to resolve the action by entering into the Shareholder Stipulation. Such resolution was necessary to satisfy the Litigation Condition in the Investment Agreement and thus was essential to the Debtor's reorganization. McCaw's consent to the Shareholder Stipulation did not require him to make a contribution to the settlement. Further, Defendants do not dispute the assertion in Plaintiff's Statement of Material Facts that McCaw and Eagle River did not provide any capital or pay any monies towards the Debtor's reorganization. Defendants' counsel also did not refute Plaintiff's counsel's assertion during the February 4, 2004 hearing that McCaw provided no consideration to the Plan.

Regarding the consideration provided, while substantial assets were contributed regarding the New York Shareholder Action that provided distributions to the Class, the record indicates that the contribution of assets was not made by Defendants, but entirely from the Senior Secured Lenders in the form of a "gift" [28] to the Class in order to satisfy the Litigation Condition. (This assumes that the reference in the Plan to assets was to financial consideration. The record before the Court does not refer to any other type of asset.) Specifically, as discussed earlier, in consideration of the plaintiffs and the Class agreeing to the Shareholder Stipulation Release and agreeing to dismiss the action and thus necessary to XO's satisfaction of the Litigation Condition to the Investment Agreement, the Senior Secured Lenders provided the Class with a potential recovery under either the FL/Telmex Plan or the Stand–Alone Plan. The benefit to the Senior Secured Lenders in funding the Shareholder Stipulation was that it would (1) secure a superior financial recovery for XO and its creditors, including the Senior Secured Lenders, based on the proposed transactions under the Investment Agreement, or, alternatively, (2) provide XO with a meritorious and valuable cause of action against the Investors for any wrongful termination or breach of the agreement. Ultimately, the later resulted in an approximately $8.33 million distribution to the Class under the Investors Settlement based upon a $25 million settlement payment from the Investors.

Absent the satisfaction of the Litigation Condition, there would have been no plausible way to proceed with FL/Telmex Plan unless the condition was waived, and it was made clear by Investors that such waiver would not be provided. As previously discussed, the deteriorating marketplace, coupled with the possibility of proceeding with the FL/Telmex Plan that was received as above present market value or, alternatively, having a possible valuable cause of action against the Investors if the FL/Telmex Plan was not consummated, made it essential to make every effort to achieve the satisfaction of the Litigation Condi-

---

**28.** The Debtor makes references to the term "gift" in the various Plan documents. One reference is to the contribution made by the Senior Secured Lenders to fund the Share-holder Settlement and the other is the Senior Secured Lenders' contribution of reorganized XO equity to fund the unsecured creditors' distribution.

tion.[29] Although the Litigation Condition was not the only condition necessary to satisfy the Debtor obligations under the Investment Agreement, it remained the most difficult to satisfy.

In the Confirmation Order, where the Court found, among other things, that each of the nondebtor parties that will benefit from the Plan Releases, shares an identity of interest with the Debtor and has contributed substantial assets to the Debtor's reorganization that would provide for certain distributions which would otherwise not have been made available, such finding as to the contribution of substantial assets is simply not accurate based upon the Court's review of the record. In fact, as discussed above, Defendants concede that no consideration was provided, or required, by them under the Plan. However, the Senior Secured Lenders that facilitated the Shareholder Stipulation, which, in turn, satisfied the all-important Litigation Condition, provided substantial assets in the form of a "gift." Regardless, the nondebtor releases under the Shareholder Stipulation are supported by the substantial consideration provided by the Senior Secured Lenders and the effect of the nondebtor released parties' consent had in relation to the Shareholder Stipulation. Such consent to the Shareholder Stipulation was essential, in part, because of indemnification/contribution exposure of the Debtor, evidencing the "identity of interest," as well. All of the aforementioned focused on trying to achieve a superior recovery under a proposed plan of reorganization in a rapidly declining market. The absence of any of the articulated elements would have eliminated any possibility of (1) effectuating the FL/Telmex Plan as contemplated under the Investment Agreement, or (2), if the FL/Telmex Plan was not effectuated, commencing an action against the Investors for failure to fulfill their obligations under the Investors Agreement.

The absence of consideration by Defendants is not fatal to their release under Claimants' Release regarding the breach

---

**29.** The Court notes that the rapidly declining marketplace resulted in certain ironies regarding the parties' positions regarding the value of XO. The plaintiffs in the shareholder class actions related to the restructuring proposal under the November 2001 Investment Agreement commenced those actions in late 2001 and early 2002 alleging that the Investors and XO's management had undervalued XO under the agreement, that XO's management had breached its fiduciary duties in entering into that agreement, and that the Investors were culpable as well for their role in the process. Even after the Investors increased their investment under their restructuring proposal in early 2002, certain bondholders in March 2002 continued to oppose the transaction contemplated under the Investment Agreement on the basis that they believed that XO undervalued by that transaction. XO, which with the support of the bondholders took the necessary steps to close under the Investment Agreement, now argues that the transaction represented a superior recovery to anything else that could be achieved in the marketplace by that time. By contrast, the Investors' economic interests were better served by a failure of the Debtor to satisfy the Litigation Condition and other conditions— because, as stated previously, the Investment Agreement would have resulted in the Investors paying in excess of then market value for XO.

As far as the consideration to be paid to the Class in the New York Shareholder Action, as discussed in the text above, under each of XO's proposed plans it was to come form Senior Secured Lenders' portion of the alleged excess market value. Either the consideration would come from the Senior Secured Lenders' recovery if the FL/Telmex Plan became effective or from any Successful Recovery from the litigation commenced under the Stand–Alone Plan against the Investors for not complying with their obligations under the Investment Agreement regarding the FL/Telmex Plan.

of fiduciary related actions,[30] in that the record a finding of unique circumstances is clearly supported by the confirmation record. The substantial consideration provided to the Class by the Senior Secured Lenders, the identity of interest present as a result of indemnification/contribution exposure of the Debtor, and the necessity of the satisfaction of the Litigation Condition to the Plan process, all form the basis of a finding fully consistent with *Metromedia's* clarification on nondebtor releases. Therefore, the Court finds that the confirmation record supports the unique circumstances necessary, under *Metromedia*, for allowing the nondebtor releases concerning the breach of fiduciary duty type actions.

Regarding the Court's ruling in the Clifton Action, an action premised upon a breach of fiduciary duty related to the Investment Agreement, that the action was subject to the Plan Releases, Plan Discharge, and Plan Injunctions is fully consistent with the unique circumstances that warranted approval of such Plan provisions. The Clifton Action was a breach of fiduciary duties action based upon the XO entering into the Investment Agreement and, therefore, related to the conduct alleged in the litigation that was the subject of the Litigation Condition. All the facts, previously discussed by the Court, that supported the nonconsensual Claimants' Release under the breach of fiduciary type actions, were present concerning the Clifton Action.

As to the Section 16(b) Action, the Court finds that its confirmation related findings regarding the nonconsensual nondebtor release under the Claimants' Release could not, as a matter of law, support a release of Defendants' liability under that action. First, unlike the New York Shareholder Action where defendants' consent therein, and the Senior Secured Lenders contribution of substantial value in the form of a gift to the Class, enabled the Debtors to satisfy the Litigation Condition to effectuate the Investment Agreement, the Section 16(b) Action had no relationship to the Litigation Condition or any of the other the factors that resulted in the findings that supported approval of the Claimants' Release regarding the various actions or potential actions related to the breach of fiduciary duty issues.

Second, and more importantly, there could not have been, as a matter of law, a finding of the Court or evidence presented that would have established the element of "identity of interest" exists between the Debtor and former XO director McCaw as to the Section 16(b) Action. The record reveals that the finding of identity of interest in the Confirmation Order is premised upon the identity of interest between the Debtor and Defendants regarding the breach of fiduciary duty issues and any related indemnification obligation of the Debtor.[31] This is consistent with the typi-

**30.** The Court notes that the Second Circuit, in response to appellants in *Metromedia* contending that aside from "any other limitation on nondebtor releases, good and sufficient consideration must be paid to any enjoined creditor," found that "[s]uch consideration has weight in equity, but it is not required." *Metromedia*, 416 F.3d at 143. Furthermore, the Second Circuit also rejected "appellees' argument that because appellants were allocated a Plan distribution, they received consideration and, therefore cannot be heard to complain about the nondebtor releases," rea-

soning that "a nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out." *Id.*

**31.** Defendants support their nonconsensual nondebtor release contentions in their motion to dismiss the Section 16(b) Action by citing, in part, to the Debtor's pleadings filed in this Court to enjoin to the Clifton Plaintiffs from further pursuing the Clifton Action. The Court notes that the Debtor argued in the

cal circumstances surrounding the relationship between a nondebtor released party and a debtor corporation. In that, the identity of interest prong is generally established based premised upon indemnification principles whereby a debtor corporation would be required to indemnify a former director of any liability.[32] *See generally Master Mortgage*, 168 B.R. at 935 ("There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete assets of the estate."). In a Section 16(b) cause of action, indemnification by the issuing corporation would run counter to public policy underlying Section 16(b). *See Schaffer*, 286 F.Supp.2d at 283, n. 6 ("Court is persuaded that allowing indemnification for [Section] 16(b) violations [by the issuing corporation] would frustrate the public policy behind the statute because liable parties would not have to return their short-swing profits to the plaintiff issuer."). Further, the Debtor has no identity of interest with McCaw's affiliate Eagle River because any such identity of interest would at best be derivative of McCaw, who does not have such an identity of interest.[33] Therefore, the "exceptional" set of circumstances that allowed the Debtor to proceed with a Plan process that captured market value and arguably some excess to market, in a steadily declining market, had nothing to do with the release of the Section 16(b) Action and could not as a matter law under the circumstances presented been essential to the Debtor.

Accordingly, since the confirmation related findings could not have established circumstances necessary for approving a nondebtor release of Defendants' liability

January 15, 2003 hearing to enjoin the Clifton Plaintiffs that a prime rationale for approving the third-party nondebtor releases in the Plan was that an identity of interest existed between the Debtor and the nondebtor parties by virtue of indemnification obligations that would pass through the Plan and remain with the Debtor for such nondebtor parties. *See* Jan. 15, 2003 Hr'g Tr. at 37 (Case No. 02–12947, filed Oct. 2, 2003, Docket No. 696).

32. The Court notes that there is no evidence or argument that there was any allegation on the part of the Debtor to indemnify anyone from Section 16(b) liability.

33. The Court notes that although Defendants argue that it was the Debtor's intention to release the Section 16(b) Action, there is no indication in the record that McCaw conditioned his consent to the Shareholder Stipulation on being released from liability under the action. If Defendants' assertions are accurate, questions are raised regarding McCaw's role in the Plan process as an XO director; specifically as to (1) how the XO board of directors dealt with the release of a potential liability of a director to the corporation, considering such director provided no consideration for the release of that liability, there was no identity of interests regarding the same, and the fact, regarding the merits of the Section 16(b) Action, that it survived a motion to dismiss, (2) what role McCaw had in the alleged determination to include such release in the Plan, and (3) how was such a release warranted when it had no relationship to the Litigation Condition, the resolution of which was essential to the Plan process and one of the unique circumstances that supported the Plan Releases. Further, to the extent the XO board of directors did intend the release of the Section 16(b) Action, how was any conflict of interest issues regarding that release addressed in its Plan deliberations. Also, there was no notice to the Court, Creditors' Committee, or any party in interest that any Section 16(b) action was being released. Notice would have been required because as opposed to the release of the Litigation Condition type actions, all of which pending actions were listed, the release of a Section 16(b) Action, as fully discussed in the text of this opinion, involves the release of an action that the Debtor would have no liability but was a potential source of funds to the Debtor. However, because these concerns are not before Court, there is no need to address them further herein.

under the Section 16(b) Action, the Court finds that as a matter of law the Claimants' Release did not include the release of Defendants' liability under the action for the release would be impermissible under its "fullest extent permissible under applicable law" language.[34] Such application of the Claimants' Release to a Section 16(b) action, absent the circumstances present regarding fiduciary duty related actions, would be an abuse as cautioned in *Metromedia.*

Based upon the foregoing, the Court concludes that Plaintiff is entitled to summary judgment as a matter of law that the nonconsensual part of the Claimants' Release did not include his Section 16(b) Action.

### c. *Plan Injunctions And Plan Discharge*

██ Since the scope of the Plan Injunctions was limited by the scope of the Plan Releases, the ineffectiveness of the releases regarding the Section 16(b) Action limits the injunctions such that they do not reach the action. *See* Plan § 10.6; *see supra* note 14. As to the Plan Discharge, the Court also notes that while the Debtor was named as a nominal defendant in the Section 16(b) Action, as discussed previously in section II.D.3 of this opinion, there was neither a claim against the

Debtor nor its resources being implicated in any obligation by the statutory-insider Defendants in defending or satisfying their Section 16(b) liability under the action; rather, a "[Section] 16(b) action represents a potential source to augment the estate to the benefit of all its creditors, at no expense to it." *Schaffer,* 286 F.Supp.2d at 282–83. The Plan Discharge therefore does not provide Defendants relief from any liability under the Section 16(b) Action.

Based upon the foregoing, the Court concludes that Plaintiff is entitled to summary judgment as a matter of law that the Plan Injunctions and Plan Discharge are inapplicable to his Section 16(b) Action.

### F. *Preclusive Effect Of New York Final Order And Judgment And Shareholder Stipulation Approval Order*

#### 1. *Plaintiff's Contentions*

Plaintiff argues that the Shareholder Stipulation does not bar the Section 16(b) Action under the principle of res judicata. In particular, Plaintiff asserts that since the Debtor was subject to the jurisdiction and oversight of this Court, the Debtor moved for approval of the Shareholder Stipulation, but did not move to have this Court adjudicate the claims raised in the

---

**34.** As previously referenced, there is a dispute between the Debtor and Defendants as to whether the Debtor intended to release Defendants' from liability under the Section 16(b) Action. Defendants argue, and Plaintiff appears not dispute, that the plain reading of the broad release language of the relevant Plan Release would include a securities cause of action such as the Section 16(b) Action. However, Plaintiff argues that such release (regarding a Section 16(b) Action) could not be granted as matter of law. Since the Court finds that Defendants' liability under the Section 16(b) Action was not released under the Plan Releases as a matter of law, the Court will not address the issue raised by Defen-

dants. However, if the Court were required to determine that issue, it would do so in the context of the Plan documents as an integrated contract and, after having considered such documents, whether a Section 16(b) cause of action was included. The Court's analysis would entail an analogy to *Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp.,* No. 00 Civ. 8688, 2004 WL 1119652 (S.D.N.Y. May 20, 2004), where principles of integrated contract interpretation were applied in reading a debtor's plan of reorganization and disclosure statement together for analyzing which claims where preserved under the plan.

New York Shareholder Action or to issue a judgment. Plaintiff thereby maintains that this Court, in issuing the Shareholder Stipulation Approval Order, neither rendered a "final order" nor an "order and final judgment" in the action; instead, this Court disposed of an administrative matter related to XO's bankruptcy case. Specifically, Plaintiff asserts that this Court issued an order that merely approved a settlement adjudicated in the New York Supreme Court, but did not alter or amend in any way the terms and conditions of the New York Final Order and Judgment, which contained the Shareholder Stipulation Release.

Plaintiff argues that under *Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 375, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), where a state-court judgment, like the New York Final Order and Judgment herein, relates to an exclusive federal claim, such as the Section 16(b) Action, this Court must first look to New York preclusion law to ascertain the preclusive effect of the New York Final Order and Judgment on his claim. Plaintiff asserts that to decide otherwise would be an unprecedented usurpation of the powers of state courts to define the scope of their own judgments and would directly conflict with precedent under *Matsushita*.

Plaintiff maintains that under New York law, a judgment in a prior suit precludes a subsequent suit if, among other things, the claims of the prior and subsequent suits arise out of the same transaction or connected series of transactions at issue. Thus, Plaintiff notes that the Section 16(b) Action, which sought disgorgement of short-swing profits of more than $36 million realized by Defendants as XO insiders in 2000, did not arise from the same transactions as the claims that were released by the New York Final Order and Judgment, which concerned the restructuring of XO

through the January 2002 Investment Agreement, which, in turn, reflected the terms and conditions of the Investors' Proposal in November 2001. Plaintiff further contends that the dismissed Clifton Action, unlike the Section 16(b) Action, did in fact stem from the same facts and circumstances as the New York Shareholder Action.

Moreover, Plaintiff contends that the New York Final Order and Judgment would violate his right to due process. Plaintiff emphasizes that a prior class action judgment will not bind an absent class member in a subsequent suit if the class member was not afforded adequate notice, an opportunity to be heard, the right to opt out of the class, and adequate representation. Plaintiff asserts that his interests were not adequately represented since they were entirely adverse to the Class representatives in the New York Shareholder Action. Specifically, Plaintiff notes, at the time of such action, he was not only a shareholder, but a bondholder as well. As a bondholder, Plaintiff argues that he had a continuing pecuniary interest in the Debtor because his interest in XO would survive bankruptcy under the Plan and thereby he would indirectly benefit from any recovery obtained by XO as a consequence of his Section 16(b) Action. In contrast, Plaintiff asserts that the Class representatives were only equity shareholders of XO whose interests under the Plan were to be eliminated and thereby they would not benefit at all from any recovery obtained by XO as a consequence of the Section 16(b) Action.

Quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir.1982), Plaintiff also asserts that for certain releases to be appropriate in a class action settlement, due process requires that class members are properly notified of a settlement of their claims so that release of the

claims is "foreseeably obvious." *Id.* at 461. Plaintiff contends that nowhere in the Shareholder Settlement Notice sent to Class members was a release of the pending Section 16(b) Action against Defendants disclosed and that such release forfeited the Section 16(b) Action's potential recovery of millions for the benefit of the Debtor. Moreover, Plaintiff contends that given that the transactions concerning the Section 16(b) Action were unrelated to the transactions of the New York Shareholder Action, it would be absurd to suggest that a release of the Section 16(b) Action in conjunction with the settlement of the New York Shareholder Action was clearly foreseeable. Therefore, Plaintiff argues that since he had inadequate representation and notice in the New York Shareholder Action, his due process would be violated if he were precluded from bringing the Section 16(b) Action because of the New York Final Order and Judgment.

### 2. *Defendants' Contentions*

Defendants contend that Plaintiff's Section 16(b) Action is precluded by the Shareholder Stipulation Release, which released each and every "Settled Claim" against "Released Parties," that is, against Defendants, from "all … causes of action … in connection with, based upon, arising out of or relating to any act or omission, transaction, event or other occurrence taking place on or prior to the Plan Effective Date in any way relating to … the Debtor …," and enjoins the Class, including Plaintiff from prosecuting the action against Defendants. Shareholder Stipulation § A, B.1; *see supra* note 7.

Defendants assert that although Plaintiff attempts to evade the effect of the New York Final Order and Judgment approving the Shareholder Stipulation on due process grounds that (1) his interests were not adequately represented in the New York

Shareholder Action because he was a bondholder as well as a shareholder at the time of such class action, and (2) because he did not receive adequate notice that his Section 16(b) Action would be released by the action, the plain language of the Shareholder Stipulation clearly includes the Shareholder Stipulation Release, which releases the Debtor's officers and directors for all claims relating to the Debtor by all shareholders as of the Petition Date. Defendants also contend that the Shareholder Stipulation was approved by the New York Supreme Court after the Class received appropriate notice of the proposed Shareholder Stipulation that described the release, and the Class was given an opportunity to object. Furthermore, Defendants assert that Plaintiff does not dispute that the Shareholder Stipulation Release language releases his Section 16(b) Action, that he was a member of the Class, and that he received the proposed Shareholder Settlement Notice that describes the release.

Defendants argue that Plaintiff's due process arguments also fail because he cannot attack a class action settlement on such grounds where the initial court resolved the due process issues. Quoting *Epstein v. MCA, Inc.*, 179 F.3d 641 (9th Cir.1999), Defendants also assert that "[d]ue process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court and by the courts that review its determinations; due process does not require collateral second-guessing of those determinations and that review." *Id.* at 648. Defendants therefore contend that Plaintiff is barred from collaterally attacking the New York Final Order and Judgment.

Defendants further argue that the Section 16(b) Action is barred by the Share-

holder Stipulation Approval Order. Although Plaintiff contends that such order has no res judicata effect on his Section 16(b) Action because this Court must look only to the New York Final Order and Judgment and to New York law to assess whether the settlement of the Shareholder Stipulation has preclusive effect, Defendants assert that this contention ignores that this Court approved the Shareholder Stipulation in the Shareholder Stipulation Approval Order, which is a "final judgment." Since the Shareholder Stipulation Approval Order was issued pursuant to 28 U.S.C. §§ 157, 1334, Defendants claim that the preclusive effect of that order is determined by federal preclusion law, which provides that when a court of competent jurisdiction has entered a final judgment on the merits of an action, concerned parties to the suit are bound to such adjudication. Defendants further note that Plaintiff did not object to and took no appeal from the Shareholder Stipulation Approval Order or from the Confirmation Order and, thus, cannot now challenge the Shareholder Stipulation Approval Order.

### 3. *Analysis*

The Court will first address whether the New York Final Order and Judgment en-joined the Section 16(b) Action. Although Defendants' preclusion contentions predominantly focus on the Section 16(b) Action being precluded by the Shareholder Stipulation Approval Order, since they also assert that the Shareholder Stipulation itself precludes the action, the Court will first address preclusive effect of the New York Final Order and Judgment, approving such stipulation. If the Court determines that such order did not preclude the action, it will review the preclusive effect of the Shareholder Stipulation Approval Order based on Defendants' contention that such order was a final order and judgment on the merits, either standing alone or by its incorporation into the Confirmation Order by the Court and, thereby, under federal preclusion law, whether it carried broader preclusive effect than the New York Final Order and Judgment.

 Further, since Defendants contend that the Shareholder Stipulation Release released them from liability under the Section 16(b) Action by virtue of the action having been deemed to have been adjudicated on the merits, their above res judicata contentions under either order concern claim preclusion, not issue preclusion.[35]

---

**35.** "Res judicata is a judicial doctrine encompassing two different principles, commonly referred to as claim preclusion and issue preclusion." *Brantley v. New Haven Firefighters Local 825*, No. 3:03 CV 1904, 2004 WL 2381791, at *2 (D.Conn. Oct.15, 2004) (reviewing *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)); *cf. Allen v. McCurry*, 449 U.S. 90, 94 n. 5, 101 S.Ct. 411, 66 L.Ed.2d 308 (noting while some courts and commentators use "res judicata" as generally meaning both forms of preclusion, that is, "claim preclusion" and "issue preclusion," RESTATEMENT (SECOND) OF LAW OF JUDGMENTS § 74 (Tent. Draft No. 3, 1976) refers to "res judicata" as "claim preclusion" and "collateral estoppel" as "issue preclusion."). "Claim preclusion generally refers to the effect of a prior judgment in

foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire*, 532 U.S. at 748, 121 S.Ct. 1808. Specifically, under claim preclusion, "[i]f subsequent litigation arises from the same cause of action, then the prior decision bars litigation not only of all matters which were 'actually offered and received to sustain the demand, but also [of] every [claim] which might have been presented.'" *In re Grossinger's Assocs.*, 184 B.R. 429, 433 (Bankr.S.D.N.Y.1995) (quoting *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 n. 3 (11th Cir.1990)). "The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropri-

### a. Preclusive Effect Of New York Final Order And Judgment

Since the pending Section 16(b) Action is an exclusively federal claim, the Court must determine the effect of the New York Final Order and Judgment under the applicable federal preclusion law regarding the effect of a state court judgment on such a claim.

 "When faced with a state-court judgment relating to an exclusively federal claim, a federal court must first look to the law of the rendering State to ascertain the effect of the judgment." *Matsushita,* 516 U.S. at 375, 116 S.Ct. 873 (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 381–82, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985)). A federal court "should not give the state court judgment any greater preclusive effect than the courts of the state would give it." *Cullen v. Margiotta,* 811 F.2d 698, 732 (2d Cir. 1987); see RESTATEMENT (SECOND) OF LAW OF JUDGMENTS § 86 cmt. g (noting, in part, that "28 U.S.C. § 1738 can be read as prescribing not only the minimum effect of a state judgment but also its maximum effect; that is, a state judgment is to have 'the same' faith and credit as under the law of the rendering state, no more as well as no less."). Second, if "state law indicates that the particular claim or issue would be barred from litigation in a court of that State, then the federal court must next decide whether, 'as an exception to [the federal Full Faith and Credit Act, 28 U.S.C.] § 1738,' it 'should refuse to give preclusive effect to [the] state court judgment.'" *Matsushita,* 516 U.S. at 375, 116 S.Ct. 873 (quoting *Marrese,* 470 U.S. at 383, 105 S.Ct. 1327). This later part of this analytical framework for deciding whether a state-court judgment precludes an exclusive federal action is unnecessary because the Supreme Court noted in *Matsushita* that section 27 of the Exchange Act, *see* 15 U.S.C. § 78aa ("Section 27"), which specifically provides federal courts, as opposed to state courts, "exclusive" sub-

---

ate tribunal usually ought not to have another chance to do so." *Id.* at 434 (quoting RESTATEMENT (SECOND) OF LAW OF JUDGMENTS ch. 1 at 6 (1982)). In contrast, "[i]ssue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire,* 532 U.S. at 748–49, 121 S.Ct. 1808. The underlying principle of issue preclusion is that "one who has actually litigated an issue should not be allowed to relitigate it. . . ." *Grossinger's Associates,* 184 B.R. at 434 (quoting RESTATEMENT (SECOND) OF LAW OF JUDGMENTS ch. 1 at 6 (1982)).

Since Defendants essentially argue that claim preclusion applies to the Section 16(b) Action and since claim preclusion is an affirmative defense under Rule 8(c), which is made applicable herein under Bankruptcy Rule 7008(a), "the defendant generally is required to plead it in his [or her] answer." *Brantley,* 2004 WL 2381791, at *3; *see* FED.R.CIV.P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . res judicata . . . and any other matter constituting an . . . affirmative defense."). Defendants did not file an answer in this adversary proceeding, but moved to dismiss pursuant to Rules 8(a), 9(b), and 12(b)(6). "When, however, 'all relevant facts are shown by the court's own records . . . the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer.'" *Id.* (quoting *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992)). Additionally, "the Court may consider matters of which judicial notice may be taken in evaluating a motion to dismiss under [Rule] 12(b)(6), which include 'prior pleadings, orders, judgments, and other items appearing in the Court's records of prior litigation that is closely related to the case *sub judice* [, especially where a res judicata defense is predicated on facts not disputed in the earlier litigation].'" *See id.* at *3 n. 4 (quoting *Hackett v. Storey,* No. 3:03 CV 395, 2003 WL 23100328, at *2 (D.Conn. Dec. 30, 2003)). The Court will thereby review the record in the New York Shareholder Action for guidance in its claim preclusion analysis.

ject matter jurisdiction over a Section 16(b) suit,[36] does not provide an expressed or implied repeal of the federal full faith and credit statute under 28 U.S.C. § 1738. *Matsushita,* 516 U.S. at 385–86, 116 S.Ct. 873. Therefore, New York preclusion law is determinative as to whether the New York Final Order and Judgment precludes the Section 16(b) Action.

■■■■■■ New York courts have adopted a transactional analysis approach in deciding claim preclusion issues, holding that "once a claim is brought to a final conclusion, all other claims arising out of the same transactions or series of transactions are barred, even if based upon different theories or if seeking a different remedy. . . ." *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 690 N.Y.S.2d 478, 712 N.E.2d 647, 649–50 (1999) (quoting *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158, 1159 (1981)) (applying a transactional analysis approach in finding that "where a plaintiff in a later action brings a claim for damages that could have been presented in a prior CPLR article 78 proceeding against the same party, based upon the same harm and arising out of the same or related facts, the claim is barred by res judicata"); *see Smith v. Russell Sage Coll.,* 54 N.Y.2d 185, 445 N.Y.S.2d 68, 429 N.E.2d 746, 749 (1981); *Reilly v. Reid,* 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172, 174–77 (1978) (noting that approach of RESTATEMENT (SECOND) OF LAW OF JUDGMENTS § 61 (Tentative Draft No. 1, 1973) (now § 24 of RESTATEMENT (SECOND) OF LAW OF JUDGMENTS (1982)[37]) was in accord with New York preclusion law and finding that "where the same foundation facts serve as a predicate for each proceeding, differences in legal theory and consequent remedy do not create a separate cause of action"); *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986) (noting similar New York transactional analysis approach to res judicata). Nevertheless, under New York law, "claim preclusion does not apply where the party against whom preclusion is asserted was unable in the first action to obtain *complete relief* because of limitations on the subject matter jurisdiction of or other obstacles in the initial forum." *Rosen v. Paul, Hastings, Janofsky & Walker LLP,* No. 05 Civ. 4211, 2005 WL 1774126, at *2 (S.D.N.Y. July 28, 2005) (noting, among others, *Parker,* 690 N.Y.S.2d 478, 712 N.E.2d at 650 (finding res judicata is inapplicable where excep-

---

**36.** Section 27 of the Securities Exchange Act of 1934 states, in pertinent part, as follows:

> The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

15 U.S.C. § 78aa.

**37.** Section 24 of RESTATEMENT (SECOND) OF LAW OF JUDGMENTS (1982) provides as follows:

> (1) When a valid and final judgment rendered in an action extinguishes the plain-

tiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.
> *The general rule of this Section . . . is subject to the exceptions stated in § 26.*

.

tions under section 26(1)(c) of RESTATE-MENT (SECOND) OF LAW OF JUDGMENTS (1982) [38] are present); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (claim preclusion inapplicable under New York law where " 'the initial forum did not have the power to award the full measure of relief sought in the later litigation' ") (quoting *Davidson,* 792 F.2d at 278); *Heimbach v. Chu,* 744 F.2d 11, 14 (2d Cir.1984) (application of claim preclusion depends on whether "court in which the first action was brought would have been willing and able to consider the theory that is being advanced in the second action.")) (emphasis added); *see Marrese,* 470 U.S. at 382, 105 S.Ct. 1327 ("If a state preclusion law includes th[e] requirement of prior jurisdictional competency [enumerated under RESTATEMENT (SECOND) OF LAW OF JUDGMENTS § 26(1)(c) (1982) ], which is generally true, a state judgment will not have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts."); *see generally Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 287 (2d Cir.2002) (noting that "res judicata does not bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action").

■ In terms of jurisdictional competency of the New York Supreme Court, the New York Court of Appeals has opined in *American Distilling Co. v. Brown,* 295 N.Y. 36, 64 N.E.2d 347 (1945) that Section 27 of the Exchange Act, which provides federal courts with exclusive jurisdiction over a Section 16(b) cause of action, "did not confer jurisdiction upon the courts below to entertain [such an] action." *Id.* at 349; *cf. Cullen,* 811 F.2d at 732 (noting that under "New York law ... a claim is not barred by res judicata if the court in which the first action was brought lacked subject matter jurisdiction to adjudicate the claim," and finding that "New York regards the federal courts as having exclusive jurisdiction over RICO claims, and the New York state courts, therefore, as having no jurisdiction to entertain such claims"). Based on *American Distilling,* it would appear that the New York Supreme Court did not have jurisdictional competency to adjudicate the Section 16(b) Action.

However, subsequent to *American Distilling Co.,* the New York Court of Appeals created a common law action in *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), similar to a Section 16(b) statutory cause of action in requiring disgorgement of insider trading profits. In *Diamond,* the court found that an officer or director may be required to disgorge to a corporation any gains realized by him or her from transactions in the corporation's stock as a result of his or her use of material inside information in breach of his or her fiduciary duty to the corporation, without regard to whether

---

*Id.*

**38.** Subsection (1)(c) of Section 26 of RESTATEMENT (SECOND) OF LAW OF JUDGMENTS (1982) provides as follows:

(1) When any of following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
. . .

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief;

*Id.*

such corporation suffered any damages from the transactions and not limiting the transactions to the less than six-month period requirement of Section 16(b). *Id.* at 911–15; *see Excelsior 57th Corp. v. Lerner,* 160 A.D.2d 407, 553 N.Y.S.2d 763, 765 (N.Y.App. Div., 1st Dep't 1990) (applying *Diamond* rationale); *see generally Thomas v. Roblin Indus., Inc.,* 520 F.2d 1393, 1397 (3rd Cir.1975) (reviewing, in part, *Diamond's* holding); *but see Frankel v. Slotkin,* 795 F.Supp. 76, 81 (E.D.N.Y.1992) (noting that since Rule 10(b)–5 has developed into an effective remedy for insider trading and because Section 16(b) allows for recovering short-swing profits by statutory insiders, "a common law claim [such as in *Diamond*] to recover profits from insiders presents an actual, and needless, risk of double liability") (citing *Freeman v. ·Decio,* 584 F.2d 186, 191–96 (7th Cir.1978)) (interpreting Indiana law to reject *Diamond*).

*Diamond* is broader in one respect than Section 16(b) because it is not limited by the statute's less than six-month period requirement. However, in another respect it is more limited. In that, it requires a finding of use of insider information by the fiduciary in order to prevail, whereas under Section 16(b) no such finding is required, for it is a strict liability statute. Therefore, regarding the Section 16(b) Action, "complete relief" necessary to have claim preclusive effect is clearly not available because Plaintiff's Section 16(b) complaint as pled would be dismissed under *Diamond* for the complaint requests for disgorgement of Defendants' realized profits based on strict liability, in that no use

of insider information by the Defendant is pled.[39] Accordingly, the Court finds that the New York Supreme Court did not have jurisdictional competency to adjudicate the Section 16(b) Action and, therefore, its New York Final Order and Judgment does not preclude the action.

Having found that complete relief was not available in the state court, the Court need not address the scope of the transactional analysis. However, the Court notes that it is not disputed that the Section 16(b) Action has no transactional nexus to the conduct alleged in the actions related to the Litigation Condition.

Based upon the foregoing, the Court concludes that Plaintiff is entitled to summary judgment as a matter of law that the New York Order and Judgment did not preclude his Section 16(b) Action.

### b. *Preclusive Effect Of Shareholder Stipulation Approval Order*

Since the New York Final Order and Judgment did not preclude the Section 16(b) Action, the Court will determine whether the Shareholder Stipulation Approval Order precludes the Section 16(b) Action. Defendants' preclusion contention based on the Shareholder Stipulation Approval Order is that such order was a final order treated as a final judgment on the merits of the Court and, therefore, it carried broad federal preclusive effect barring the Section 16(b) Action regardless of whether the action was transactionally related to the New York Shareholder Action. In order to be accorded such preclusive effect, the Court must

---

**39.** The Court does not reach the issue as to whether complete relief would have been available, if Plaintiff had pled use of insider information by Defendants. For even if the action as filed was consistent with *Diamond,* it would arguably fail under state law if the use of insider information were not established, whereas Section 16(b) liability could be established even if a finding regarding insider information were not made. Therefore, the issue of the absence of complete relief may still be present even if the Section 16(b) complaint were pled consistent with *Diamond.*

first determine whether the Shareholder Stipulation Approval Order was a final order and judgment for purposes of res judicata. If the Shareholder Stipulation Approval Order is afforded federal preclusive effect, the Court must then examine federal preclusion law regarding a federal final judgment to determine whether the continuation of the Section 16(b) Action is precluded.

▮ Turning first to the issue of "finality," since the Shareholder Stipulation Approval Order was one of the Conditions to Effectiveness of the Shareholder Stipulation and this Court's approval of such stipulation assisted in bringing an end to the New York Shareholder Action, the Court finds that the Shareholder Stipulation Approval Order was a "final order" from which an appeal could be taken. *See Adam v. Itech Oil Co. (In re Gibraltar Res., Inc.)*, 210 F.3d 573, 576 (5th Cir.2000) ("A bankruptcy court's approval of a settlement order that brings to an end litigation between parties is a 'final' order."); *Beaulac v. Tomsic (In re Beaulac)*, 294 B.R. 815, 818 (1st Cir. BAP 2003) (noting that a bankruptcy order approving the stipulation of a settlement is a final order from which jurisdiction exists to hear an appeal) (citing 28 U.S.C. § 158(a)). It has been "recognize[d] that for appellate purposes, '[t]he standard for finality in bankruptcy matters is more flexible than in ordinary civil litigation, because bankruptcy proceedings often continue for long periods of time and discrete claims are resolved from time to time over the course of the bankruptcy proceeding.'" *Tracar v. Silverman (In re Am. Preferred Prescription, Inc.)*, 265 B.R. 27, 31 (E.D.N.Y.2000) (quoting *Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 885 (2d Cir.1996)); *see generally Drexel*, 960 F.2d at 285 (finding a district court's order approving a settle-

ment agreement as final for purposes of appeal, where it noted that it has "traditionally accorded a more flexible definition to concepts of finality and appealability in bankruptcy cases" and that "an order in a bankruptcy case is appealable if the order 'finally disposes of [a] *discreet dispute* [ ] *within the larger case.*'") (quoting *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1283 (2d Cir.1990)) (italics in original).

Notwithstanding the Shareholder Stipulation Approval Order being "final" for appellate purposes, there is a conflict in case law as to whether a bankruptcy court order approving a settlement pursuant to Bankruptcy Rule 9019 can constitute a "final judgment" with preclusive effect. *See generally Tracar*, 265 B.R. at 31 (noting that "the standard for finality for res judicata purposes is different than that applied for when determining whether an order may be appealed."). The Eleventh Circuit in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544 (11th Cir.1990), noted that "[w]hen a bankruptcy court decides whether to approve or disapprove a proposed settlement, it must consider" several factors, including:

(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 1549 (quoting *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir.) (quoting *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985)), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93

L.Ed.2d 122 (1986)). Further, the Eleventh Circuit in *Justice Oaks II* noted that "[w]hen the bankruptcy court below approved the settlement agreement between [the parties], the court was required to determine only the probability of success should [certain parties'] claims be litigated, the difficulty of collecting on those claims, and the other creditors' interest." *Id.* However, the Eleventh Circuit found that "[i]n making these determinations, the court had to consider many factors other than the merits of [certain parties'] claims. The court, moreover, never had to *decide* the merits of those claims-only the *probability* of succeeding on those claims." *Id.* (emphasis in original). The Eleventh Circuit concluded in *Justice Oaks II* "that a bankruptcy court's order authoring settlement of a claim cannot constitute a final judgment on the merits for purposes of former adjudication. Therefore, the bankruptcy court's order authorizing settlement of [certain parties'] claims cannot be given preclusive effect as a final judgment on the merits." *Id.*

Similarly, in the Debtor's Bankruptcy Rule 9019 motion seeking approval of the Shareholder Stipulation, the Debtor emphasized that in determining whether the settlement is reasonable, this Court should consider nearly identical factors enumerated in *Justice Oaks II*. Debtor's Bankr.R. 9019 Mot. ¶ 30 (citing, among others, *A & C Properties*, 784 F.2d at 1381). Furthermore, the motion also provided that "[r]ulings on proposed compromises and settlements under [such factors] make clear that *a court's evaluation not become a minitrial on the merits of the claims involved.* Rather, the [c]ourt should give weight to the debtor's informed judgment that a compromise is fair and equitable to the estate." Debtor's Bankr.R. 9019 Mot. ¶ 31 (emphasis added).

Nonetheless, it has been observed in *In re Joint Eastern and Southern District Asbestos Litigation*, 129 B.R. 710 (E.D.N.Y.1991), *vacated on other grounds by* 982 F.2d 721 (2d Cir.1992), *modified on rehearing by* 993 F.2d 7 (2d Cir.1993), that "[o]nce approved by the bankruptcy court, a compromise takes the form of an order of the court and has the effect of a final judgment." *Id.* at 861; *see* 10 COLLIER ON BANKRUPTCY § 9019.01, p. 9019–3 (15th ed. rev.2004) ("An order approving a settlement will be reversed only if the lower court has been guilty of an abuse of discretion. Once it has become final, an order approving a settlement has the same res judicata effect as any other order of a court.") (citing *Bezanson v. Bayside Enters., Inc. (In re Medomak Canning)*, 922 F.2d 895, 900 (1st Cir.1990) (noting that "[g]enerally, a court-approved settlement receives the same *res judicata* effect as a litigated judgment....")). Additionally, in *Corbett v. MacDonald Moving & Storage, Inc.*, No. CV 92–5092, 1996 WL 33344489 (E.D.N.Y. Oct.1, 1996), the district court noted that "[b]ankruptcy orders, including questions that go to jurisdiction, are final judgments on the merits." *Id.* at *8.

The Court finds that even if the Shareholder Stipulation Approval Order standing alone is not a final order for preclusive effect purposes, since the order was incorporated into the Confirmation Order, which has the same effect as a final judgment on the merits that is accorded preclusive effect, *see Tracar v. Silverman (In re Am. Preferred Prescription, Inc.)*, 266 B.R. 273, 277 (E.D.N.Y.2000) ("It is well-settled that a bankruptcy court's order confirming a reorganization plan constitutes a final judgment on the merits and is to be given preclusive effect under res judicata.") (citing multitude of supporting cases), the Shareholder Stipulation Ap-

proval Order is accorded federal preclusive effect.[40]

■ Turning to the effect of federal preclusion law, in the instant matter, the Court recognizes that such may not be limited by the "complete relief" referenced above in the context of the New York preclusion law because under federal preclusion any cause of action that could have been brought between the parties referenced in the Settled Claims would not be limited as it is under New York preclusion law. As discussed above, Defendants argue that since the Section 16(b) Action could have been brought in a federal court and the bankruptcy court is a federal court, the broader "cause of action" scope of federal preclusion applies to such action. However, regardless of the Shareholder Stipulation Approval Order being deemed a final judgment as discussed above and being given federal preclusive effect, the Court finds that the order did not expand the scope of the New York Order and Final Judgment. In that, although a federal final judgment is not as limited as a state final judgment in its preclusive effect, in order to establish federal preclusion of a final judgment it must be "foreseeably obvious" that the claim at issue will be released.

First, in *Caruso v. Candie's, Inc.*, 201 F.R.D. 306 (S.D.N.Y.2001), a district court noted the following:

> The Second Circuit has held that "in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims

in the settled class action even though the claim was not presented and might not have been presentable in the class action."

> "Release is appropriate 'where there is a realistic identity of issues between the settled class action and the subsequent suit,' but only if class members have been properly notified of a settlement of their claims so that release of the claims is *'foreseeably obvious.'* "

*Id.* at 315 (quoting *Feuerman v. Sears, Roebuck & Co.*, No. 96 Civ. 0120, 1996 WL 648966, at *6 (S.D.N.Y. Nov.6, 1996) (quoting, in turn, *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir.1982))) (emphasis added). While the Shareholder Stipulation Release incorporated into the New York Final Order and Judgment provided for a broad release of any action related to the Debtor, the Court notes, as found earlier, that the release of the Section 16(b) Action was not within the scope of the state court order under federal preclusion law because complete relief in the state court could not have been granted. Therefore, in order for this Court's approval of the Debtor's Bankruptcy Rule 9019 motion to have the preclusive effect argued by Defendants, it would have to have expanded the scope of the New York Final Order and Judgment and such expansion would have to be found to be "foreseeably obvious."

When the Debtor filed its Bankruptcy Rule 9019 motion seeking approval of the Shareholder Stipulation and subsequently presented its motion at the August 26, 2002 hearing, it sought an approval order based on the settlement being in the best interests of the Debtor's estate. *See, e.g.*,

---

**40.** In determining whether claim preclusion applies to preclude later litigation, a federal court in the Second Circuit must find that "the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Anaconda–Ericsson Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 190 (2d Cir.1985).

Aug. 26, 2002 Hr'g Tr. at 58 (Case No. 02–12947, filed June 11, 2003, Docket No. 668) (Debtor's counsel stating "in summation, we believe this [Bankruptcy Rule 9019] application is in the best interest of the Debtor, and we would ask the Court to approve the Order."). As Plaintiff correctly asserts, the Debtor moved for approval of the Shareholder Stipulation because it was subject to the jurisdiction and oversight of the Court. However, the Court did not review approval of the Shareholder Stipulation in terms of fairness to the Class within the New York Shareholder Action. Rather, the New York Supreme Court addressed such fairness and found in its New York Final Order and Judgment on August 22, 2002 that the Shareholder Stipulation was in the best interests of the Class.

Additionally, Defendants' preclusion contentions acknowledge that due process of the Class was addressed by the New York Supreme Court. However, in reviewing due process afforded to the Class when they released any Settled Claims against the Release Parties and the corollary preclusive effect of such a release, the New York Supreme Court could have only considered release of claims that were related to those matters it could have provided complete relief and were transactionally related to such matters. In that, having previously determined that the New York Final Order and Judgment did not preclude the Section 16(b) Action, it follows that that order being brought before the Court would involve any form of relief impacting the Class beyond that which could have been within the scope New York Final Order and Judgment. In considering the effect of the Shareholder Stipulation Approval Order, the Court finds no basis under the circumstances to find that federal claim preclusion principle would expand the reach of the term "Settled Claim" beyond that considered by the New York Supreme Court in its fairness and due process determinations, without requiring a separate "due process" analysis for such expanded relief. Otherwise, such an expansion would run afoul of the due process of the Class. As stated previously, such due process analysis regarding the Class was never at issue before this Court when it approved the Shareholder Stipulation.

Further, the Court finds that the Debtor's affidavit in support of the proposed Scheduling Order concerning its Bankruptcy 9019 motion further supports that the motion primarily focused on whether it was in the best interest of the Debtor's estate to enter into the settlement of the New York Shareholder Action and was not seeking to address the fairness of the settlement to the Class or to expand the scope of the New York Order and Final Judgment. The affidavit specifically requested if the Debtor could forego providing notice of the motion to over a thousand creditors, including bondholders, and to shareholders, instead only notice major parties in interest. The Scheduling Order found such notice constituted good and sufficient notice and no other or further notice was needed. However, in the context of how such notice would be interpreted by its recipient, the Court finds that the Debtor in seeking a limitation of notice of the Scheduling Order only to certain creditors of the Debtor's bankruptcy estate, and not noticing the Class, would not make it foreseeably obvious to anyone that the Court's approval process would provide broader relief beyond that which was sought in the New York Shareholder Action. Furthermore, as Plaintiff correctly points out, in issuing the Shareholder Stipulation Approval Order, the Court did not alter or amend the terms and conditions of the New York Final Order and Judgment. Moreover, all preclusion, whether state or

federal, is premised upon principles of fundamental fairness. The role of this Court regarding the Shareholder Stipulation approval process was to determine whether the settlement was best interests of the Debtor's estate. To grant the relief sought by Defendants would result in a process, designed to protect the interests of the bankruptcy estate, to become a mechanism to expand the scope of a state court settlement without notice or rationale for such expansion. In conclusion, under the circumstances presented, it would not be "foreseeably obvious" to any party that the Section 16(b) Action would be precluded by any final judgment and order regarding the Shareholder Stipulation Approval Order.

Based upon the foregoing, the Court concludes that Plaintiff is entitled to summary judgment as a matter of law that the Shareholder Stipulation Approval Order did not preclude his Section 16(b) Action.

### III. Conclusion

The Court concludes that (1) Plaintiff has standing to seek the relief requested in this proceeding, (2) Section 29(a) and the *Goodman* exception are inapplicable for determining the effectiveness of the Plan Releases, (3) since the Section 16(b) Action was not a cause of action that belonged to the Debtor's estate, the Debtor could not release that action and, therefore, the Debtor's Release is ineffective in relieving Defendants from liability under the action, (4) the nonconsensual part of the Claimants' Release did not release Defendants from liability under the Section 16(b) Action as a matter of law because the confirmation related findings did not establish unique circumstances necessary under *Metromedia* for approving such a non-debtor release, (5) since the scope of the Plan Injunctions is defined by the Plan Releases, the ineffectiveness of the releases concerning the Section 16(b) Action lim-

its the injunctions' scope such that they do not reach the action, (6) because there is neither a claim against the nominal defendant Debtor nor its resources are implicated in any form by Defendants in defending or satisfying their liability under the Section 16(b) Action and since the action represent a potential source to augment, rather than reduce, the Debtor's estate to the benefit of all its creditors and at no expense to it, the Plan Discharge is ineffective, (7) neither the New York Order and Final Judgment, the Shareholder Stipulation Approval Order, nor the Confirmation Order precludes the Section 16(b) Action, and (8) none of the Plan provisions regarding discharge, injunction, or a continuation of the section 362 stay, prevent the continuation of the Section 16(b) Action by Plaintiff.

Therefore, Defendants' Rule 12(b)(6) motion to dismiss the Complaint's second claim for relief seeking a declaratory judgment is denied because the second claim for relief sets forth a claim upon which such relief can be granted. Further, Plaintiff's Rule 56 motion for summary judgment regarding the Complaint's second claim for relief seeking a declaratory judgment is granted because there is no genuine issue as to any material fact and Plaintiff is entitled to summary judgment as a matter of law on such claim.

Counsel for Plaintiff is directed to settle an order consistent with this opinion.